# PENNSYLVANIA BUREAU OF CORRECTION *v.* UNITED STATES MARSHALS SERVICE ET AL.

No. 84–489.   Argued October 15, 1985—Decided November 18, 1985

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 43.

*Leroy S. Zimmerman*, Attorney General of Pennsylvania, argued the cause for petitioner. With him on the briefs were *Maria Parisi Vickers*, *Andrew S. Gordon*, and *Allen C. Warshaw*, Senior Deputy Attorneys General.

*Mark I. Levy* argued the cause for respondents. With him on the brief were *Acting Solicitor General Fried*, *Acting Assistant Attorney General Willard*, *Deputy Solicitor General Geller*, and *Barbara L. Herwig*.

JUSTICE POWELL delivered the opinion of the Court.

The question presented is whether a United States district court may compel the United States Marshals Service to transport state prisoners to the federal courthouse to testify in an action brought under 42 U. S. C. § 1983 by a state prisoner against county officials.

I

In June 1980, Richard Garland brought suit under 42 U. S. C. § 1983 against various Philadelphia County officials in the United States District Court for the Eastern District of Pennsylvania, alleging that he had been beaten and harassed by the defendant deputy sheriffs and prison guards. At the time Garland filed this suit, he was incarcerated in the Philadelphia County jail, but was subsequently transferred to a state facility. The District Court assigned the action to a Magistrate for disposition on the merits.

In December 1982, the Magistrate issued writs of habeas corpus *ad testificandum* to produce five witnesses, including plaintiff Garland. At that time, Garland was in a state cor-

rectional facility in Huntingdon, approximately 220 miles from Philadelphia. The other four witnesses were all confined in state facilities over 100 miles from Philadelphia. The orders directed the Wardens of the state facilities to transport inmates from state prison to the county jail nearest the federal courthouse in Philadelphia. The orders then commanded the United States Marshals Service (Marshals)[1] to transport the inmates from that county facility to the federal court and to maintain custody of them during trial. The Marshals unsuccessfully moved for reconsideration of that portion of the order that directed them to transport the state prisoners from the county jail to the federal courthouse and to guard them during trial.

On the Marshals' appeal from this denial, the Court of Appeals for the Third Circuit reversed in part, holding that the All Writs Act did not confer power upon the District Court "to compel *non-custodians* to bear the expense of [the production of witnesses] simply because they have access to a deeper pocket." *Garland* v. *Sullivan*, 737 F. 2d 1283, 1287 (1984) (emphasis in original).[2] The Court of Appeals did find, however, that the District Court has the power to compel the Marshals to take custody of state prisoners while those prisoners are in the federal courthouse in connection

[1] The Marshals are within the Executive Branch of the Federal Government. The Marshal for each district is appointed by the President, 28 U. S. C. § 561(a), is subject to the supervision and direction of the Attorney General, see, *e. g.*, §§ 562, 567, 569(c), 571(a) and (d), and is funded through Department of Justice appropriations, *e. g.*, § 567.

[2] Judge Becker concurred in the judgment, believing the court to be bound by *McClung* v. *Silliman*, 6 Wheat. 598 (1821), and *McIntire* v. *Wood*, 7 Cranch 504 (1813). He hoped that this Court would "find that, because statutes can adapt to fit the needs of changing times, the All Writs Act now permits what, in the time of *McIntire* and *McClung* it did not." 737 F. 2d, at 1292 (footnote omitted). Judge Atkins, sitting by designation from the Southern District of Florida, concurred in part and dissented in part, believing that the Third Circuit could impose a duty on the Marshals to transport state prisoners. *Ibid.*

with federal judicial proceedings. *Ibid.* Finally, the court held that the District Court could order the Marshals to take custody of state prisoners if the trial court made a specific finding that special security risks required that state prisoner-witnesses be in the Marshals' custody away from the federal courthouse. *Id.*, at 1289.

The Commonwealth Bureau of Correction (Commonwealth) petitioned this Court for a writ of certiorari on the question whether a federal court can command the Marshals to share responsibility with state officials for transporting state inmates to the federal courthouse when neither the State nor any state official is a party.[3] Because this case presents a recurrent problem on which the Circuits differ, we granted the writ. 469 U. S. 1206 (1985). We find that there is no statutory authority for a United States district court to command the Marshals to take custody of state prisoners outside the federal courthouse during the normal course of producing state prisoner-witnesses for trial, and accordingly affirm.

## II

The Commonwealth argues that the Marshals have a statutory obligation to obey the lawful orders and writs of the federal courts, 28 U. S. C. § 569(b), and are statutorily authorized to expend funds for the specific purpose of transporting prisoners, § 567. It also contends that these provisions recognize the authority of the district courts to seek assistance from the Marshals. Two Circuits have summarily agreed. *Ford* v. *Allen*, 728 F. 2d 1369, 1370 (CA11 1984) *(per curiam); Ballard* v. *Spradley*, 557 F. 2d 476, 481 (CA5 1977). Two other Circuits have relied in part on these provisions in

---

[3] The propriety of that part of the order commanding the Marshals to take custody of the state prisoners while they are in the federal courthouse is not specifically before us. The Marshals have conceded that they are responsible for the custody of state prisoners in the federal courthouse as witnesses or parties.

imposing the responsibility for transport upon the Marshals. *Wiggins* v. *County of Alameda*, 717 F. 2d 466 (CA9 1983), cert. denied *sub nom. California Dept. of Corrections* v. *United States*, 465 U. S. 1070 (1984); *Ford* v. *Carballo*, 577 F. 2d 404 (CA7 1978). The Court of Appeals for the Third Circuit is the only Circuit to deny a district court authority to compel the Marshals to assist in transporting state prisoner-witnesses to the federal courthouse.

Sections 569(b) and 567 merely enumerate obligations of the Marshals. The Marshals must obey the mandates of federal courts and transport prisoners if the court so orders. The courts' authority to issue such writs, however, must derive from some independent statutory source. We therefore must look to the habeas corpus statute or the All Writs Act to see if they authorize federal courts to order the transportation of state prisoners to the federal courthouse.

## III

The Court of Appeals reasoned that the Magistrate's order amounted to a writ of habeas corpus *ad testificandum*[4] properly directed only to the custodian, and that there was no basis in the habeas corpus statute for the District Court's authority to direct a writ *ad testificandum* to a noncustodian. We agree.

Since 1867, the writ of habeas corpus has incorporated the common-law command that the writ "*shall* be directed to the person in whose custody the party is detained." Act of Feb. 5, 1867, ch. 28, 14 Stat. 386 (emphasis added). See *In re Thaw*, 166 F. 71, 74–75 (CA3 1908). It was the custodian who then was to "make return of said writ and bring the party before the judge who granted the writ." *Ibid.* Con-

---

[4] The habeas corpus statute provides in pertinent part that the writ "shall be directed to the person having custody of the person detained," and that "the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained." 28 U. S. C. § 2243.

gress preserved this unambiguous directive throughout subsequent revisions, and the current habeas corpus statute states that the writ "shall be directed to the person having custody of the person detained." 28 U. S. C. § 2243. Section 2243 also specifically provides that "the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained."

The language of the statute thus expressly commands the custodian to bring his prisoner to the court, but extends this duty to no other. See also Fed. Rule Civ. Proc. 81(a)(2) ("The writ of habeas corpus . . . shall be directed to the person having custody of the person detained"). We find no evidence in the language of §§ 2241 and 2243, in their legislative history, or in the common-law writ *ad testificandum* to suggest that courts are also empowered to cause third parties who are neither custodians nor parties to the litigation to bear the cost of producing the prisoner in a federal court. We therefore conclude that there is no basis in the habeas corpus statute for a federal court to order the Marshals to transport state prisoners to the federal courthouse.[5]

---

[5] *Carbo* v. *United States*, 364 U. S. 611 (1961), does not support an expansive reading of the power conferred upon federal district courts by the writ of habeas corpus *ad testificandum*. In *Carbo*, the Court found that although § 2241 contained an express territorial limitation of "[w]rits of habeas corpus," 28 U. S. C. § 2241(a), the limitation applied to habeas corpus *ad subjiciendum*, but not to habeas corpus *ad prosequendum*. The Commonwealth similarly argues that the provisions in § 2243 that direct the custodian to produce the prisoners in court do not apply to the writ *ad testificandum* but instead are limited to the Great Writ, habeas corpus *ad subjiciendum*.

*Carbo*'s expansive reading of the statute was consistent with common-law procedure and requirements applied to the writ *ad prosequendum* and with the legislative history of § 2241(a). 364 U. S., at 615–618. But this case involves the writ *ad testificandum*, which has been confined in its application to the actual custodian of the prisoners from before its initial codification in 1789 to the present. We therefore do not believe that *Carbo* justifies a more expansive view of the writ of habeas corpus *ad testificandum* today.

## IV

Finally, the Commonwealth argues that the All Writs Act, 28 U. S. C. § 1651,[6] confers authority upon a district court to order the Marshals to transport state prisoners to and from the federal courthouse in connection with federal litigation. It argues that the "deluge of . . . civil rights actions" calls for "creative" use of federal judicial power to alleviate the drain on the States' fiscs from the transport of inmates to and from federal courthouses.

It is true that this Court consistently has construed the All Writs Act to authorize a federal court "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States* v. *New York Telephone Co.*, 434 U. S. 159, 172 (1977). This Court also has held that the supplemental powers of the Act are not limited to situations where it is "necessary" to issue the writ or order "in the sense that the court could not otherwise physically discharge its appellate duties." *Adams* v. *United States ex rel. McCann*, 317 U. S. 269, 273 (1942). An examination of the language of the All Writs Act, its legislative history, and our decisions construing it convinces us, however, that the Act does not authorize a district court to order the Marshals to transport state prisoners from state prisons to the federal courthouse in the ordinary course of litigation in federal courts.

The All Writs Act originally was codified in § 14 of the Judiciary Act of 1789, 1 Stat. 81–82, which provided that

> "all the . . . courts of the United States, shall have power to issue writs of *scire facias, habeas corpus,* and all other writs not specifically provided for by statute,

---

[6] The All Writs Act provides in pertinent part:

"The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law."

Our early view of the scope of the all writs provision confined it to filling the interstices of federal judicial power when those gaps threatened to thwart the otherwise proper exercise of federal courts' jurisdiction. *McClung* v. *Silliman*, 6 Wheat. 598 (1821); *McIntire* v. *Wood*, 7 Cranch 504 (1813). This limitation is especially significant in construing federal courts' power to issue writs of habeas corpus *ad testificandum:* The Judiciary Act of 1789 codified the *ad testificandum* writ in the same section as the all writs provision.

The original phrase "not specifically provided for by statute" remained in the all writs section until 1948. Although the legislative history is scant, it appears that Congress then merely consolidated various provisions into § 1651 and made "necessary changes in phraseology" without substantive amendment. See H. R. Rep. No. 308, 80th Cong., 1st Sess., A144 (1947); see also *id.*, at 5. The legislative history did, however, state that the new section was "expressive of the construction recently placed upon [the all writs provision] by the Supreme Court in *U. S. Alkali Export Assn.* [v. *United States*, 325 U. S. 196 (1945)]." *Id.*, at A145. In *United States Alkali*, the Court rejected use of the all writs provision to enable the Court to review a lower court's determination where jurisdiction did not lie under an express statutory provision. Chief Justice Stone wrote:

"The writs may not be used as a substitute for an authorized appeal; and where, as here, the statutory scheme permits appellate review of interlocutory orders only on appeal from the final judgment, review by certiorari or other extraordinary writ is not permissible in the face of the plain indication of the legislative purpose to avoid piecemeal reviews." 325 U. S., at 203.

Although Congress dropped the phrase "not specifically provided for by statute" in its 1948 consolidation, we conclude that it apparently intended to leave the all writs provision substantially unchanged. That intention and the favorable reference to *United States Alkali* convince us that the 1948 changes in phraseology do not mark a congressional expansion of the powers of federal courts to authorize issuance of any "appropriate" writ.

Nevertheless, the Commonwealth, relying on *United States* v. *New York Telephone Co.*, *supra*, at 171, as well as *Harris* v. *Nelson*, 394 U. S. 286, 299 (1969), and *Price* v. *Johnston*, 334 U. S. 266, 282 (1948), insists that under the All Writs Act the District Court can order the Marshals to transport state prisoners upon a mere statement that such an order would be "necessary or appropriate." As summarized in the margin below, these cases are clearly distinguishable and lend little support to the Commonwealth's argument.[7]

---

[7] In *United States* v. *New York Telephone Co.*, 434 U. S. 159 (1977), the Court held that a District Court could under the All Writs Act compel a third party, the New York Telephone Company, to assist the Federal Bureau of Investigation in installing devices under a warrant that would register the numbers dialed on certain telephones. In that case the All Writs Act filled a gap in federal statutes by granting the District Court jurisdiction over the only party capable of installing the devices. In the instant case, by contrast, the habeas corpus statute already expressly provides for the issuance of a writ "to the person having custody of the person detained."

In *Price* v. *Johnston*, 334 U. S. 266 (1948), the Court held that a Court of Appeals could order a prisoner to be brought before it to argue his own appeal, finding that the All Writs Act was a mechanism to achieve the "rational ends of law." *Id.*, at 282. In *Price*, however, there was no alternative way to bring the prisoner before the court. In the present case, the traditional writ *ad testificandum* is sufficient. Similarly, *Harris* v. *Nelson*, 394 U. S. 286 (1969), held that the District Court in that case had no alternative means of providing an effective habeas corpus proceeding except by use of an extraordinary writ. *New York Telephone*, *Price*, and *Harris* afforded resort to the All Writs Act to fill statutory interstices. We do not find their reasoning controlling here, where a writ *ad testifican-*

The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling. Although that Act empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate. We need not categorically rule out reliance on the All Writs Act and the use of Marshals in procuring or safeguarding state prisoner-witnesses in the course of federal litigation. There may be exceptional circumstances in which a district court can show clearly the inadequacy of traditional habeas corpus writs, such as where there are serious security risks. In such circumstances, a district court may find it "necessary or appropriate" for Marshals to transport state prisoners. We therefore leave open the question of the availability of the All Writs Act to authorize such an order where exceptional circumstances require it.

## V

We conclude, at least in the absence of an express finding of exceptional circumstances, that neither a magistrate nor a district court has authority to order the Marshals to transport state prisoners to the federal courthouse to testify in an action brought by a state prisoner under 42 U. S. C. § 1983 against county officials. Accordingly, we affirm the Court of Appeals for the Third Circuit.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

This is an exceptional case. It involves a dispute between the Marshals Service and a Federal District Court. Ordinarily, the marshals and the federal courts which they serve

---

*dum* directed to the custodian indisputably provides a district court with a means of producing a prisoner-witness.

have a close and harmonious relationship. To be sure, the special responsibilities of the marshal—an office that serves both the Executive and Judicial Branches—can give rise to administrative problems.[1] Customarily such problems are resolved on a voluntary, cooperative basis, either in the individual court or circuit, or in high-level discussions between the Executive and Judicial Branches.[2] Open disputes between the marshals and the courts are rare, and appropriately so.

The question whether federal marshals should be required to transport state prisoners to testify in federal litigation is, however, a recurring problem that has not been resolved amicably, either between the federal courts and the marshals[3] or between the marshals and the States.[4] The majority notes that, in "exceptional circumstances," *ante*, at 43, the district court may order marshals to transport state prisoners. I entirely agree. The majority's holding, however, is that, absent such circumstances, the district court may not

---

[1] See Report by the Comptroller General, U. S. Marshals' Dilemma: Serving Two Branches of Government (1982).

[2] See, *e. g.*, U. S. Marshals Service, Oversight Hearing before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 99th Cong., 1st Sess., 3 (1985) (citing agreement between the Attorney General and THE CHIEF JUSTICE regarding court security); *id.*, at 26 (citing agreement between the Attorney General and THE CHIEF JUSTICE regarding contract guard program); Hearings on H. R. 7039 before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 97th Cong., 2d Sess., 175 (1982) (citing agreement between the Attorney General and THE CHIEF JUSTICE regarding court security and the allocation of marshals).

[3] See *Ford* v. *Allen*, 728 F. 2d 1369 (CA11 1984) *(per curiam); Wiggins* v. *County of Alameda*, 717 F. 2d 466 (CA9 1983), cert. denied, 465 U. S. 1070 (1984); *Ford* v. *Carballo*, 577 F. 2d 404 (CA7 1978); *Ballard* v. *Spradley*, 557 F. 2d 476 (CA5 1977).

[4] See *Wiggins* v. *County of Alameda*, 717 F. 2d, at 469 ("We decry the inability of state and federal officials to resolve such matters fairly and equitably . . .").

order marshals to do so because no statute expressly author-
izes that action. In my view, this conclusion ignores the im-
portance of history and tradition in defining the relationship
between the Marshals Service and the Federal Judiciary.

History and tradition suggest that the court's authority
over the marshal is not so narrowly circumscribed as the
Court suggests. In the Judiciary Act of 1789, Congress
placed the marshal under the direction of the court. Be-
cause the office of the marshal was patterned after the office
of the common-law sheriff,[5] there was no need for Congress
to define the judge's authority to issue orders to the marshal
with any particularity. Instead, § 27 of the Judiciary Act of
1789 provided that a marshal should be appointed in each

---

[5] See U. S. Dept. of Justice, United States Marshals Service—
Then . . . and Now 3 (1978) ("the Marshal carried on the tradition of the
English common law sheriff, possessing complete authority within his baili-
wick"). Indeed, one of the objections expressed to the Judiciary Act of
1789 was that it would lead to conflicts between the federal marshals and
the local sheriffs. 1 Annals of Cong. 826 (1789) (statement of Rep. Stone)
("in different tribunals, not connected, mischiefs may happen. Will a sher-
iff be justifiable in delivering up his prisoner to the marshal, or will it be a
proper return by the marshal that the prisoner is kept by the State sher-
iff"). In 1792, moreover, Congress expressly provided that "the marshals
of the several districts and their deputies, shall have the same powers in
executing the laws of the United States, as sheriffs and their deputies in
the several states have by law, in executing the laws of their respective
states," 1 Stat. 265—a provision that, in substance, exists today, 28
U. S. C. § 570. On the power of the sheriff at English common law, see
G. Atkinson, Sheriff-Law 5 (1861) ("The sheriff is the immediate officer to
*all* the Courts at Westminster to execute writs. . . . [W]hether a writ
comes to him, by authority, or without authority, or is awarded against
whom it does not lie, he cannot doubt, or dispute its validity").

The title for the marshals may have been derived from the example of
the marshals to the British and colonial vice-admiralty courts. See L.
Ball, The United States Marshals of New Mexico and Arizona Territories 3
(1978). See also C. Ubbelohde, The Vice-Admiralty Courts and the Amer-
ican Revolution 10 (1960) (In the colonial vice-admiralty courts, "[t]he mar-
shals' duties were similar to those of a sheriff: serving processes, taking
custody of goods or people, and executing the decrees of the court").

judicial district.[6] The primary duty of the marshal, as expressed in that Act, was "to attend the district and circuit courts when sitting therein, and also the Supreme Court in the district in which that court shall sit." In carrying out his duty to execute "all lawful precepts directed to him," each marshal was given the power to appoint "one or more deputies," but such deputies were removable at will by the appropriate federal judge. Read against the background of the relationship between the judge and the sheriff that had existed at common law, it is evident that the statute simply assumed that the judge had ample power to call upon the marshal for appropriate assistance in carrying out the duties of judicial office.

Although the marshal was subsequently given a variety of other duties, including some subject to direction from the

---

[6] "SEC. 27. *And be it further enacted,* That a marshal shall be appointed in and for each district for the term of four years, but shall be removable from office at pleasure, whose duty it shall be to attend the district and circuit courts when sitting therein, and also the Supreme Court in the district in which that court shall sit. And to execute throughout the district, all lawful precepts directed to him, and issued under the authority of the United States, and he shall have power to command all necessary assistance in the execution of his duty, and to appoint as there shall be occasion, one or more deputies, who shall be removable from office by the judge of the district court, or the circuit court sitting within the district, at the pleasure of either; and before he enters on the duties of his office, he shall become bound for the faithful performance of the same, by himself and by his deputies before the judge of the district court to the United States, jointly and severally, with two good and sufficient sureties, inhabitants and freeholders of such district, to be approved by the district judge, in the sum of twenty thousand dollars, and shall take before said judge, as shall also his deputies, before they enter on the duties of their appointment, the following oath of office: 'I, A. B., do solemnly swear or affirm, that I will faithfully execute all lawful precepts directed to the marshal of the district of            under the authority of the United States, and true returns make, and in all things well and truly, and without malice or partiality, perform the duties of the office of marshal (or marshal's deputy, as the case may be) of the district of            , during my continuance in said office, and take only my lawful fees. So help me God.'" 1 Stat. 87.

Executive Branch,[7] it was not until 1861 that Congress gave the Attorney General any authority over United States marshals.[8] Furthermore, it was not until 1969 that the Attorney General formalized his control over the marshals through the establishment of the Office of the Director of the Marshals Service.[9]

Under the current statutory framework, the United States marshals owe obligations both to the Executive Branch and to the Judiciary. Thus, although as the majority points out, the Marshals Service is under the control of the Attorney General, *ante*, at 36, n. 1, marshals also remain subject to the instructions of the court.[10] Indeed, Congress has considered, but not passed, legislation to lodge control of the marshals exclusively in the Executive Branch.[11] Thus, Congress has not yet divested the Judiciary of the control of marshals that it has had since 1789, and that it has shared with the Attorney General since 1861.

Throughout our history, the marshals have played an important role in the administration of justice. Although their most dramatic exploits may be called to mind by references to names like Bat Masterson, Wyatt Earp, and David Neagle, or to events like the enforcement of civil rights legislation in the 1960's, the primary assistance to the Federal Judiciary provided by the marshals has been in the area of

---

[7] See U. S. Dept. of Justice, The Office of the United States Marshal 2–3 (1981).

[8] See Report by the Comptroller General, *supra* n. 1, at 8 ("On August 2, 1861, an act of Congress (ch. 37, 12 Stat. 285) placed U. S. attorneys and marshals under the general superintendence and direction of the Attorney General. The 1861 legislation neither explicitly repealed nor made reference to any prior statutes affecting marshals").

[9] *Id.*, at 10.

[10] See 28 U. S. C. § 569(a) ("The United States marshal of each district is the marshal of the district court and of the court of appeals when sitting in his district, . . . and may, in the discretion of the respective courts, be required to attend any session of court").

[11] See Hearings on H. R. 7039, *supra* n. 2, at 141.

protection of the trial process, including the courtroom itself, and the service of writs issued by the judges. The duty of the Marshals Service "to service the federal forum" [12] does, however, encompass more than these two specific activities.

Many aspects of the court's authority over the marshal are not set forth in detail in any Act of Congress. Thus, it is not the Congress that decided that formal proceedings in our courtroom shall be preceded by the Marshal's cry of "Oyez, Oyez." Nor is it Congress, or the United States Marshals Service, that has decided to use different language to call the court to order in other federal courthouses. Decisions of that kind concerning the administration of justice in federal courts are made by federal judges.

When a federal judge orders the marshal to open court at a particular time, or in a particular way, to provide appropriate security for a trial participant, or to escort a prisoner from the lockup in the federal building to the courtroom, the court is exercising judicial power in a manner that is certainly "agreeable to the usages and principles of law" as that phrase is used in the All Writs Act. [13] In my judgment, however, such an order is not a "writ." The court's authority to issue such directives to the marshal is therefore not derived from the All Writs Act, but rather is simply one of the powers of the federal judicial office that has long been an aspect of the relationship between the court and its officers.

These daily instances of judicial authority over the marshal reflect the conventional relationship between the court and the marshal. The closeness of the relationship is derived, not from an assertion of judicial power over an unwilling marshal, but from the cooperative nature of the shared mission to administer justice. This case represents one of those un-

---

[12] "The *raison d'etre* of the Marshal Service is to service the federal forum in civil as well as criminal litigation." *Ballard* v. *Spradley*, 557 F. 2d, at 481.

[13] The statute's original and present forms are both quoted by the Court, *ante*, at 40–41, and n. 6.

usual instances in which the ordinary mechanisms for addressing disagreements have apparently failed. The majority holds that the answer must be found in an explicit statutory delineation of each exercise of judicial authority. In my view, the nature of the shared mission of the federal courts and the federal marshals should provide the standard for resolving the dispute. Thus, the controlling question is whether the district court's order is reasonably related to the administration of justice and is a sound exercise of judicial discretion.[14]

As noted, the Court recognizes that there may be "exceptional circumstances" in which it would be appropriate for a trial court to order the marshal to transport a state prisoner to a federal courthouse. See *ante*, at 43. In my judgment, even with respect to an ordinary witness, special circumstances might make it appropriate to order the marshal to transport the witness to court, even though there may not be any common-law writ that would be available in a comparable situation. The question whether such an order to a marshal constitutes an appropriate exercise of the judge's inherent power to control the course of proceedings in a particular trial should not, in my opinion, be answered by reference to the All Writs Act, but rather by reference to the traditional relationship between the court and the marshal and to the particular facts that may support the order in a particular case.

In this case, four factors suggest that ordering the federal marshal to transport the state prisoners was a sound exercise of judicial discretion. First, federal marshals have consider-

---

[14] Four of the five United States Courts of Appeals that have considered federal-court orders to transport state prisoners for their testimony in federal litigation have viewed the issue as a question of the District Court's discretion, and located the authority for that discretion in a specific statutory provision. See cases cited in n. 3, *supra*.

able expertise in transporting prisoners to federal courts;[15] moreover, the marshals acknowledge that they have ample authority to transport state, as well as federal, prisoners when appropriate.[16]   Second, in this instance, the federal marshal will be responsible for the prisoners when they are in the federal courthouse.[17]   Third, federal marshals frequently house federal prisoners at state and local jails, and, indeed, have developed special programs to serve that end.[18] Fourth, in this case, the District Court, through the Magistrate, specifically found that requiring the State to bear the entire responsibility of transporting the state prisoners for this federal litigation would impose an unfair financial hardship upon the Commonwealth of Pennsylvania.[19]   This finding derives support, not only from the particular facts disclosed by this record,[20] but also from the strong federal policy

---

[15] The marshals transported more than 130,000 prisoners in fiscal year 1984.   Oversight Hearing, *supra* n. 2, at 10.

[16] See Tr. of Oral Arg. 38–40.

[17] See *ante*, at 37, n. 3.

[18] Oversight Hearing, *supra* n. 2, at 16.

[19] See Magistrate's opinion, App. to Pet. for Cert. 58a–59a.   The Magistrate ordered the Marshals Service to transport the prisoners from the Philadelphia Detention Center to the federal courthouse in Philadelphia. The State, in contrast, remained responsible for transporting the prisoners from their prisons in other parts of the State to the Philadelphia Detention Center.   *Id.*, at 58a.

[20] The Magistrate found that the financial costs imposed by his requirement that the State transport the prisoners to the Philadelphia Detention Center were "significant," *id.*, at 59a.   Determining that it was "equitable and reasonable," *ibid.*, to refrain from imposing additional costs on the State, he emphasized that the Marshal already made frequent trips from the Philadelphia Detention Center to the federal courthouse because federal prisoners were often housed at the Detention Center during their federal trials.   *Id.*, at 60a.   According to the Magistrate's findings, the Detention Center is "relatively close" to the federal courthouse.   *Id.*, at 59a–60a.   At oral argument, the Federal Government reported that "the Marshal typically brings between six and twelve prisoners from the Philadelphia Detention Center to the Federal Courthouse on an average day." Tr. of Oral Arg. 28.

favoring cooperation with the States in the administration of civil rights litigation in the federal courts.[21]   Thus, I believe that it was an appropriate exercise of the District Court's discretion to issue the order that it did in this case.

This is not the kind of confrontation that should arise between the marshals and the federal courts.   There are a variety of mechanisms that should be used before the marshals and the courts engage in judicial combat.   The district judges and the individual marshals should be able to resolve most difficulties.   If they are unable to, the Circuit Conference should be asked to intervene.   If the problem is a recurring, national disagreement, as this issue seems to be, the Marshals Service and the Judicial Conference can seek to address it.   If these mechanisms fail, however, and if the district court issues an order to the marshal, then the historic relationship between the marshal and the courts, reflected in the current statutory framework, convinces me that the court's order should be upheld if it is reasonably related to the administration of justice and is an appropriate exercise of the district court's discretion.

Because I believe that the District Court's order in this case was fully consistent with the historic relationship between the federal court and the federal marshal, I respectfully dissent.

---

[21] Cf. Remarks of Warren E. Burger, Chief Justice of the United States, at the Dedication of the National Center for State Courts 8 (1978) ("I would hope that there will be close cooperation and coordination between our two systems—close, I repeat, but voluntary.   Our experience with the State-Federal Councils has shown us the value of cooperation").