UNITED STATES of America, Plaintiff and Counter–Defendant,

and

Wayne County Department of Health, Air Pollution Control Division, Plaintiff,

v.

State of MICHIGAN, Defendant, Counter–Plaintiff and Cross–Plaintiff,

v.

City of Detroit, a municipal corporation, and Detroit Water and Sewerage Department, Defendants and Cross–Defendants,

v.

All Communities and Agencies Under Contract with the City of Detroit for Sewage Treatment Services,

v.

Food and Allied Industries Committee of Metropolitan Detroit, a voluntary non-profit, unincorporated association, and Its Members,

v.

Greater Detroit Chamber of Commerce, a Michigan non-profit corporation, and Its Members, Intervening Rate Challengers.

No. Civ.A. 77–71100.

United States District Court, E.D. Michigan, Southern Division.

Nov. 22, 2000.

Thomas A. Mariani, Jr., Barbara A. Rogers, Department of Justice Environment & Natural Resources Division, Washington, DC, L. Michael Wicks, United States Attorney's Office, Detroit, MI, Beth S. Gotthelf, Seyburn, Kahn, Southfield, MI, Dennis J. Donohue, Warner, Norcross, Grand Rapids, MI, for Plaintiffs.

Darryl F. Alexander, Robert C. Walter, Detroit, MI, John C. Scherbarth, Michigan Department of Attorney General, Natural Resources Division, Lansing, MI, Todd B. Adams, Michigan Department of Attorney General, Environmental Protection Division, Lansing, MI, William W. Misterovich, Mount Clemens, MI, James E. Tamm, O'Connor, DeGrazia, Bloomfield Hills, MI, Leonard A. Krzyzaniak, Vandeveer Garzia, Detroit, MI, Timothy L. Cronin, Hemming, Polaczyk, Inkster, MI, William K. Fahey, Foster, Swift, Lansing, MI, Sarah K. Osburn, Plunkett & Cooney, Detroit, MI, Charles E. Lowe, Lowe, Lewandowski, Plymouth, MI, John M. Donohue, Secrest, Wardle, Farmington Hills, MI, John H. Fildew, Charles S. Kennedy, III, Fildew, Hinks, Detroit, MI, Steven D. Liddle, Macuga, Swartz, Detroit, MI, Peter W. Macuga, II, Macuga, Swartz, Detroit, MI, Marta E. Ross, Tannian & Assoc., Detroit, MI, Laura B. Harris, Salamey Assoc., Dearborn, MI, Kurt L. Heise, Dearborn Heights, MI, Stuart Trager, Salamey Assoc., Dearborn, MI, Barry A. Seifman, Farmington Hills, MI, for Defendants.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. BACKGROUND

On October 13, 2000, I ordered the United States Department of Army Corps of Engineers ("ACE") to show cause why it should not be required to accept dredged materials from Conner Creek, Michigan (a creek which flows into the Detroit River and which is located within the City of Detroit) at the Corps' Pointe Mouillee Confined Disposal Facility.

The case in which this Order issued commenced in 1977, when the Environmental Protection Agency of the United States ("EPA") brought suit against the State of Michigan; the Detroit Water and Sewerage Department ("DWSD"), an agency of the City of Detroit; and all communities and agencies under contract with DWSD for sewage treatment services. It arose because of violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, at the DWSD Treatment Plant. To correct these violations, in September 1977, a Consent Judgment was filed by the parties and approved by me. Duties and obligations between them were accordingly governed by that Consent Judgment.

Earlier, and of direct significance to this case, an Agreement was entered into on May 10, 1974 by the United States and the State of Michigan, acting through the Michigan Department of Natural Resources (now known as the Michigan Department of Environmental Quality), for construction of a contained disposal facility at Pointe Mouillee, Lake Erie. That Agreement, which applies to the relationships of the parties in this case, contains several preambles; to wit:

WHEREAS, Section 123 of the River and Harbor Act of 1970 (Public Law 91–611, approved 31 December 1970) authorized the construction, operation, and maintenance of contained spoil disposal facilities of sufficient capacity to contain the deposits of dredged materials for a period not to exceed 10 years, and

WHEREAS, maintenance and improvement of the Detroit and Rouge Rivers' channels are within the scope of the authorization contained in said Public Law 91–611; and

WHEREAS, the said Public Law 91–611 provides that the Secretary of the

Army shall obtain the concurrence of appropriate local governments and shall consider the views and recommendations of the Administrator of the Environmental Protection Agency and shall comply with the requirements of Section 21 of the Federal Water Pollution Control Act, and of the National Environmental Policy Act of 1969, and

WHEREAS, subsection (e) of Section 123 of Public Law 91–611 provides that all costs of disposal of dredged spoil from the project for the Great Lakes Connecting Channels, Michigan, shall be borne by the Government; and

> .    .    .    .    .

WHEREAS, the State is desirous of assuming the Public Law 91–611 responsibility pertaining to the project proposed herein;....

Following these recitals, the parties agreed, *inter alia,* that:

1. [I]n consideration of the Government, at the earliest permissible date, commencing construction of a Contained Spoil Disposal Facility at Pointe Mouillee, Lake Erie, adjacent to the State's Pointe Mouillee game area, for the containment and retention of dredged materials from the channels of the Detroit and Rouge Rivers, substantially in accordance with Public Law 91–611, approved 31 December 1970, it [the State] will fulfill the following, to wit:

> .    .    .    .    .

b. Hold and save the Government free from damages due to construction, operation, and maintenance of the facility.

Much later, in August of 1997, DWSD reported certain violations of its National Pollutant Discharge Elimination System ("NPDES") permit to the Michigan Department of Environmental Quality ("MDEQ"), which resulted in the issuance of a Notice of Violations by MDEQ to DWSD. Following extensive negotiations, MDEQ, DWSD, and other parties to the original Consent Judgment then entered into a Second Amended Consent Judgment, which was approved by me on August 3, 2000. Under the terms of the Second Amended Consent Judgment, at Sec. IV. *Supplemental Environmental Projects (A),* among other things:

> DWSD agrees to undertake a Supplemental Environmental Project (SEP) consisting of the dredging and disposal of approximately 146,000 cubic yards of sediment from Conner Creek. DWSD submitted a work plan and schedule to MDEQ on September 1, 1999. DWSD shall submit additional information to supplement the work plan and address questions and concerns from the U.S. Army Corps of Engineers and the MDEQ Land and Water Management Division so that permits for the project can be issued.... The project shall include a sampling and analysis component to determine whether Conner Creek is adversely impacted by accumulation of sediment between completion of the dredging activity and the point when the new Conner Creek CSO basis is complete and operational. The project shall also identify what actions, if any, need to be taken to remove unacceptable sediment accumulations that may develop. Disposal of the dredged material shall be in accordance with state and federal requirements. The dredging process shall be completed as soon as possible, but in no event after the completion of construction of the Conner Creek CSO basin.

Since construction of a required Combined Sewer Overflow Retention Basin ("CSO Retention Basin") is environmentally related to the dredging of Conner Creek, prior to May, 1999, DWSD developed a draft project plan for that basin. Due to the significant cost of the CSO Retention Basin Project ("Project"), a cost currently estimated to be $165,653,319.00, state funding for the Basin is critical to the construction of the Project.

An informational meeting held on June 2, 1999, to inform local residents of the details of the Project and to obtain public input, focused on the possible impact caused by the proposal to dewater excavating materials from Conner Creek on-site prior to disposal in a landfill. It became clear that dewatering the dredged materials on-site would be a formidable obstacle and, thus, both MDEQ and DWSD concluded that dewatering on-site would pose unacceptable impacts on surrounding landowners and uses.

Petitioning parties have informed me that in order to ensure State Revolving Fund ("SRF") funding, to commence construction of the CSO Retention Basin by January 1, 2001, the matter of the location of the dredged materials from Conner Creek must be decided now. DWSD contends that if SRF funding is not obtained, it would cost DWSD ratepayers an estimated $40 million in additional interest charges.

Lengthy negotiations have ensued between MDEQ, DWSD and the Army Corps of Engineers regarding the placement of the materials to be dredged from Conner Creek. It appears that the parties have been unable to resolve their differences, and this difficulty has led to the filing of a joint motion by DWSD and MDEQ, stemming from the Order To Show Cause. That motion states:

> In order to comply with the above-referenced requirements of the Court's February 7, 2000 Order [appointing Mayor Dennis W. Archer of the City of Detroit as Special Administrator], the Second Amended Consent Judgment, and DWSD's NPDES permit, DWSD needs to obtain, without further delay, the approval of the Department of Army Corps of Engineers ("ACE") to dispose of excavated materials from Conner Creek at the Pointe Mouillee Confined Disposal Facility ("CDF"). The CDF is owned by the State of Michigan and operated by the ACE, pursuant to a Memorandum of Agreement between the Department of the Army and the State of Michigan, dated May 10, 1974

.   .   .   .   .

> Disposal of the excavated material requires approval of the ACE. Any other disposal alternative would substantially delay (if not entirely preclude) the dredging of Conner Creek and the construction of the Conner Creek CSO retention basin, causing DWSD to violate its NPDES permit and this Court's Order, and would have potentially significant negative impacts on the public health, safety, welfare and on the environment of the surrounding community.

I construe the motion as a request for a declaratory judgment.

At a hearing on the Order to Show Cause held on November 13, 2000, the positions of the respective parties were outlined in detail before me. ACE's initial response to the Order to Show Cause contends that this court does not have jurisdiction to entertain and rule on the joint motion filed by DWSD and MDEQ.

Thus, the threshold issue before me is this court's jurisdiction to grant the relief sought by petitioning parties. I address this issue first.

## II. DISCUSSION

### A.  Jurisdiction

■ The Second Amended Consent Judgment was entered in conformity with the Clean Water Act, 33 U.S.C.A. § 1251, et seq. No one, including the ACE, disputes that the original case was properly before this court.

Title 28 of the U.S.Code Annotated § 1651(a) ("All Writs Act") states:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

The United States Supreme Court has clearly stated that the All Writs Act au-

thorizes a federal court "to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in exercise of jurisdiction otherwise obtained." *U.S. v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); *Pennsylvania Bureau of Correction v. United States Marshals Service,* 474 U.S. 34, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985).

In *New York Telephone,* the Supreme Court held that the All Writs Act authorizes federal district courts to issue orders compelling action on the part of a third party not related to the underlying action. In that case, the district court had issued an order authorizing the Federal Bureau of Investigation ("FBI") to use pen registers (devices which track a number dialed from a particular phone) on two telephone lines. The court also directed the New York Telephone Company ("the Company"), which was not connected to the underlying action, to provide all information, assistance and facilities necessary for the FBI to install and utilize the pen registers. The Company objected to providing facilities and assistance to the FBI, fearing in good faith that such an order could be issued only in connection with a wiretap order meeting the requirements of the Omnibus Crime Control and Safe Streets Act of 1968. On the Company's motion to vacate the portion of the order directing it to furnish facilities and assistance, the district court ruled that pen registers are not governed by the proscriptions of the Act, and concluded that the All Writs Act provided authority to the court to direct the Company to assist the FBI.

On appeal, the Supreme Court upheld the district court on both points. In upholding the district court's assertion that it had the authority to issue an order to a third party, the Supreme Court considered several factors: the remoteness of the party from the underlying controversy, the extent of the burden imposed by the order on the party, and the availability of alternatives that the FBI might use. The Court considered the Company sufficiently related to the underlying cause in part because, without cooperation, the FBI initiative would not succeed, and also because the Company regularly employed the same monitoring devices without court orders for billing and other business purposes. The Court also found that the Company was not overly burdened since the FBI was required to reimburse the Company, and the actions the Company were ordered to take were similar to those the Company provided on a daily basis.

Similarly, the ACE is sufficiently related to the resolution of this sewage disposal problem. Without an immediate order requiring the ACE to accept the dredged materials, DWSD will not be able to obtain the State Revolving Fund funding it requires to construct the Conner Creek CSO Retention Basin. DWSD has agreed to pay all costs associated with the disposal of the dredged materials, and the ACE has determined that the disposal would not impact or limit the operation or maintenance of the Pointe Mouillee facility. *See Exhibits S, LL of Petitioners' Brief in Support of Motion to Show Cause.* DWSD has also submitted exhibits which show that, although alternatives were sought, no other feasible solution exists to dispose of the dredged materials. Thus, under *New York Telephone,* I clearly have authority to order the ACE to accept the disposal of the dredged materials at the Pointe Mouillee CDF site.

The ACE argues additionally that *Clinton v. Goldsmith,* 526 U.S. 529, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999), holds that the All Writs Act is inapplicable to this matter, and that the Administrative Procedures Act ("APA") is the "exclusive avenue" by which the parties must proceed in this action to compel the ACE to issue a permit. That contention based on *Clinton* does not withstand scrutiny.

In *Clinton,* the Supreme Court held that an injunction issued by the Court of Appeals for the Armed Forces ("CAAF")

through the All Writs Act was neither "in aid of its jurisdiction" nor "necessary or appropriate". The CAAF had enjoined the President from dropping Goldsmith, an Air Force major, from the rolls after he had been convicted by a general court-martial of three separate offenses. The Court noted that the jurisdiction of the CAAF is limited, and did not extend to executive actions, and that the All Writs Act could not confer independent jurisdiction.

I conclude that I have jurisdiction to order the ACE to accept the dredged material because the underlying issue presents a federal question, grounded on the Clean Water Act. The ACE concedes that I would have jurisdiction to issue such an order if it was blocking implementation of the Second Amended Consent Judgment. It argues, however, that unlike the New York Telephone Company, it is not "blocking" the implementation of the Second Amended Consent Judgment.

I disagree. The actions that the ACE has taken, and also those the ACE has failed to take, are blocking and frustrating the requirements of the Second Amended Consent Judgment. In *New York Telephone*, the district court did not find that the Company was maliciously obstructing its order. In fact, the Supreme Court held that third parties who were not engaged in wrongdoing, but were in the position to frustrate the implementation of a court order, were subject to jurisdiction under the All Writs Act. 434 U.S. at 174, 98 S.Ct. 364. The ACE is impeding the implementation of this court's judgment. Even though motivated by good intention, the ACE is before me in a classic case in which the All Writs Act may be used "to effectuate and prevent the frustration of orders [the court] has previously issued in its exercise of jurisdiction otherwise obtained." *Pennsylvania Bureau of Correction*, 474 U.S. at 40, 106 S.Ct. 355.

The ACE finally argues that *Clinton* holds that the All Writs Act should not be invoked in claims against federal agencies

where the APA is applicable, *Clinton*, 526 U.S. at 539, 119 S.Ct. 1538. Yet nowhere in the *Clinton* opinion does Justice Souter compare or contrast the All Writs Act to the Administrative Procedures Act.

Courts have ordered military or other federal administrative agencies to immediate action in the past, without regard to the APA. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (district court ordered the Navy to apply for a permit); *State of Michigan v. City of Allen Park*, 954 F.2d 1201 (6th Cir.1992) (court of appeals upheld a district court order issued pursuant to the All Writs Act to compel the EPA and the MDNR to fund their shares of a sewer system evaluation study).

I conclude that the jurisdiction exists enabling me to issue an order to the ACE to accept the dredged materials from Conner Creek at the Pointe Mouillee site.

I turn now to the form of the order.

### B. *Remedy*

At the hearing before me on November 13, 2000, MDEQ, DWSD and the ACE identified three issues for me to resolve: 1) whether accepting the Conner Creek dredged materials should be considered a new use of the Pointe Mouillee CDF; 2) whether the ACE should require a new indemnification agreement of the State of Michigan; and 3) the need, if any, for immediate action.

### 1. *"New Use" Issue*

■ The first and most complex issue is whether accepting the Conner Creek dredged materials is a new use of the Pointe Mouillee CDF, not contemplated at the inception of the site.

The ACE argues that depositing the Conner Creek sediment into the Pointe Mouillee CDF is a new use because it is "environmental dredging"; that is, dredging for the purpose of enhanced environmental quality, as opposed to "navigational

dredging", or dredging for the purpose of enhancing the navigability of the Detroit and Rouge Rivers. The ACE claims that environmental dredging was not contemplated in the original Environmental Impact Statement (EIS) developed for the Pointe Mouillee site, and so at a minimum a new Environmental Assessment (EA) must be completed by the National Environmental Protection Agency (NEPA) before permitting environmental dredge to be deposited at the Pointe Mouillee CDF. Additionally, the ACE argues that the levels of cadmium and lead are far in excess of the usual deposits, and this furthers the need of an EA.

The use of the Pointe Mouillee CDF is governed by the federal statute establishing the CDF program, Section 123 of the River and Harbor Act of 1970 (33 U.S.C.A. § 1293a) and the 1974 Agreement (recited at length earlier) between the State of Michigan and the United States of America.

I have reviewed the applicable laws and the 1974 Agreement regarding the CDF to determine if the deposit of environmental dredging is permitted in the Pointe Mouillee site. I have also reviewed the original EIS, though it is not a governing document.

The 1970 River and Harbor Act is silent as to whether the use of CDF's is limited to materials dredged for navigational purpose. The statute states in pertinent part:

(a) The Secretary of the Army, acting through the Chief of Engineers, is authorized to construct, operate, and maintain ... contained spoil disposal facilities of sufficient capacity....

(g) Any spoil disposal facilities constructed under the provisions of this section shall be made available to Federal licensees or permittees upon payment of an appropriate charge for such use....

The statute does not preclude the use of the Pointe Mouillee CDF site for non-navigational dredged materials.

Additionally, the legislative background to Section 123 of the River and Harbor Act stressed the importance of enhancing the water quality and decreasing pollution. *See Message from the President,* H.R.Doc. No. 308, 91st Cong., 2d Sess. (1970) ("In order to contribute to the restoration of these magnificent waters, this Administration will transmit legislation to the Congress which would stop the dumping of polluted dredged spoil into the Great Lakes...."); *Hearings before the Subcommittee on Flood Control—Rivers and Harbors,* Committee on Public Works, 91st Cong., 2d Sess. 1073 (1970) ("noting adoption of the Administration's proposal would further the national objective of improving water quality through the prevention, control, and abatement of water pollution.").

Moreover, the 1974 Agreement states that the Pointe Mouillee CDF is "for the *containment and retention of dredged materials from the channels of the Detroit and Rouge Rivers*" (emphasis added). The Agreement does not limit the CDF to acceptance of navigational dredge materials only. Similarly, the EIS developed in 1974 for the Pointe Mouillee CDF also has no limiting language. The EIS speaks of the importance of dredging for navigational purposes, but states its main environmental impact is the "Containment of the polluted dredge spoil [which will] remove it as a source of pollution from the open waters of the bay" (Final Environmental Statement for the Pointe Mouillee CDF, Para. 3(a)). It does not preclude any form of dredged materials.

In addition, the ACE has determined that the disposal of environmental dredge is permissible at the Pointe Mouillee CDF. In an in-house legal memorandum dated October 1, 1996 (Exhibit QQ of *Petitioners' Brief in Support of Motion for Order to Show Cause* ), the then-Deputy Chief Counsel states, "It is my legal opinion that the Corps is not legally precluded from allowing the disposal of remedial dredged materials into the CDF....". The ACE itself has analyzed the applicable law and

found no legal barrier to accepting environmental dredge.

As to the level of toxins in the Conner Creek sediment, the ACE has repeatedly conceded that the toxicity is below the hazardous level. In a February 29, 2000 meeting between representatives of the ACE and DWSD regarding the use of the Pointe Mouillee CDF for the Conner Creek sediments, David Dulong, Acting Chief of the Construction–Operations Division of the ACE, stated that there is adequate capacity in the CDF to accommodate the anticipated sediment volume, and that the CDF was intended to accommodate some environmental dredging. Dulong did not dispute that the concentration of lead and cadmium are low enough that the materials are not toxic or hazardous. *See Exhibit S, Petitioners' Brief in Support of Motion for Order to Show Cause.*

In addition, MDEQ has studied the impact of depositing the Conner Creek sediment into the Pointe Mouillee CDF and determined that the site was satisfactory. In a letter to Dulong, dated July 28, 2000, Mary Ellen Cromwell, Acting Chief of the Land and Water Management Division of MDEQ stated, "The DEQ, after discussions with the Department of Natural Resources (DNR), has determined that the proposed Conner Creek dredged materials are suitable for disposal into the Pointe Mouilee Confined Disposal Facility (CDF)...." It then listed certain conditions, mostly regarding the time frame for the dredging, and ended with, "The state of Michigan is in favor of the placement of the Conner Creek materials into the Pointe Mouilee CDF." *Exhibit MM, Petitioners' Brief in Support of Motion for Order to Show Cause.*

Indeed, at the hearing, after counsel for DWSD read the above excerpt on the record, I asked counsel for the ACE if he objected or took a position contrary to the MDEQ. He responded, "I have no objection to make at this time." Transcript, p. 48.

Having considered the full background of the Pointe Mouillee CDF, the correspondence between the ACE, DWSD, and MDEQ, I find that the disposal of the Conner Creek material into the Pointe Mouillee CDF is not a new use of the facility. Considering the MDEQ assessment and the concessions of the ACE, I also find that the levels of cadmium and lead are not beyond the site's capability. Accordingly, the ACE does not need to have a new EIS or EA developed by NEPA to determine if the site may be used for the Conner Creek dredged materials.

The concern that the ACE has is misplaced. The projects, construction of a large retention basin and the dredging of Conner Creek, are lofty and expensive environmental goals. They are significant improvements to water quality. To accomplish this, no further studies are necessary.

### 2. Indemnification Agreement

■ The ACE has demanded a new, broad indemnification agreement from the State of Michigan before it allows the disposal of the Conner Creek materials into the Pointe Mouillee site. It has apparently requested the additional agreement fearing that the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) has created additional liability beyond that included in the 1974 Agreement.

The 1974 Agreement echoes the statute (33 U.S.C.A. § 1293a(c)(3)) by stating that the State holds harmless the federal government from "damages due to construction, operation, and maintenance of the facility". This Agreement, and so, too, the hold harmless clause, is still in effect. No further assurances by the State of Michigan are necessary; it has already contracted to hold the United States Government free from *any* liability connected with the operation of the site, whether the liability arises from CERCLA or other law.

A point of clarification is necessary here. I note that while I have found that it is not necessary for the ACE to have a new EIS or EA developed by NEPA, to determine if the site may be used for Conner Creek dredged materials, it appears that separately and with regard to the permit required for the CSO Retention Basin, MDEQ has revealed that it will issue an EA immediately upon receipt of my order, and will conduct a thirty-day public comment period (beginning November 27, 2000). *See Exhibit E, Supplemental Submittal of the City of Detroit Water and Sewer Department Re: Motion for Order to Show Cause.*

3. *Need For Immediate Action*

■ The ACE accurately points out that the dredging of Conner Creek is not scheduled to begin until 2002. This, the ACE states, shows that there is no timing crisis under the Consent Judgment to support injunctive relief now against the ACE.

Though it is true that the work may not physically begin until 2002, as I noted in the factual background above, state funding is an imperative requirement of the Second Amended Consent Judgment. In order to process the application for the State Revolving Fund funding, MDEQ has required that DWSD have a named disposal site for the Conner Creek dredged materials. MDEQ must also issue a permit for the Conner Creek CSO Retention Basin, and this must be issued by December 27, 2000, in order to comply with the Second Amended Consent Judgment deadline of January 1, 2001.

DWSD has informed me that in order to receive SRF monies, it must have the issue of the disposal site finalized by November 22, 2000. Without the state funding, DWSD claims its ratepayers would incur an estimated $40,000,000 in additional interest charges. *See* Letter to MDEQ Director Russell J. Harding dated July 21, 2000, included in *Exhibit J, Supplemental Submittal of the City of Detroit Water and Sewer Department Re: Motion for Order to Show Cause.*

This monetary crisis demands immediate action to decide the disposal site of the Conner Creek dredged materials.

**III. *CONCLUSION***

In sum, I find that I have jurisdiction to issue an order compelling the ACE to act. I also find that the disposal of the Conner Creek dredged materials is not a new use of the site. Further, I find the indemnification agreement within the 1974 Agreement is sufficient to hold the federal government free from liability for operating the Pointe Mouillee CDF. Finally, I find it necessary to issue injunctive relief immediately.

**ORDER**

ACCORDINGLY, IT IS ORDERED that:

1. The ACE accept dredged materials from Conner Creek for disposal at the Pointe Mouillee Confined Disposal Facility.

2. I find that, pursuant to the Agreement Between the United States of America and the State of Michigan Acting Through the Michigan State Department of Natural Resources for Local Cooperation at Detroit and Rouge Rivers, Michigan, dated May 10, 1974, the ACE has obtained from the State of Michigan the statutorily required liability protection language to which it is entitled under Section 123 of the River and Harbor Act of 1970, 33 U.S.C. § 1293a, and I ORDER that no further liability protection language from the State of Michigan is required or authorized by law.

3. Since I find that the proposed disposal at the Pointe Mouillee CDF of dredged materials from Conner Creek does not constitute a new use of the facility, I ORDER that it is not necessary that the ACE conduct a review of such disposal under the National Environmental Policy

Act, or have developed a new EIS or EA by NEPA.