**Matthew CHABAL, Jr., Appellant,**

v.

**Ronald REAGAN, et al.**

No. 87–5751.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) March 10, 1988.

Decided March 14, 1988.

Richard K. Willard, Asst. Atty. Gen., James J. West, U.S. Atty., Douglas N. Letter, Scott R. McIntosh, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for appellees.

Clifford A. Rieders, Robert H. Vesely, Rieders, Travis, Mussina, Humphrey & Harris, Williamsport, Pa., for appellant.

Before WEIS, GREENBERG and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question for decision in this appeal is clear cut and straightforward: does the President of the United States have the power to remove a United States Marshal from office? Matthew Chabal, Jr., former Chief Marshal for the United States District Court, Middle District of Pennsylvania, was removed from office by President Reagan. Chabal filed a complaint in October 1985 against the United States, the Department of Justice, the United States Marshals Service, the President, and several other federal officials. He alleged that the President had removed him from his position as marshal in violation of the first and fifth amendments of the United States Constitution and the federal civil service laws. He sought declaratory relief, reinstatement, back pay, and damages. After remand from this court, *Chabal v. Reagan*, 822 F.2d 349 (3d Cir.1987), the district court transferred one of Chabal's claims for money damages to the Court of Claims pursuant to the Little Tucker Act, 28 U.S.C. § 1346(a)(2), and dismissed the remaining claims for failure to state a claim on which relief can be granted, under Rule 12(b)(6),

F.R.Civ.P. *Chabal v. Reagan*, 633 F.Supp. 1061 (M.D.Pa.1986). Chabal appeals and we affirm.

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. We have jurisdiction of this appeal under 28 U.S.C. § 1291.

## I.

United States Marshals are Presidential appointees, nominated for office by the President and confirmed by the Senate. 28 U.S.C. § 561(a). Chabal was appointed to the Middle District position in 1982. In August 1985, he received an unsatisfactory annual performance rating from the United States Marshals Service. One month later the President removed him from office.

Chabal seems to contend that his removal from office stemmed from difficulties he encountered in working with Chief Deputy Richard Reynolds. We will discuss this issue in Part V of the opinion. However, it will not, indeed cannot, affect our disposition of the case.

Two aspects of the district court's decision are not challenged by Chabal on appeal. The district court ruled that it had no jurisdiction over Chabal's statutory claim under the federal civil service laws. This claim was subsequently reviewed by the Court of Appeals for the Federal Circuit. *See Chabal v. Dep't of Justice*, 818 F.2d 875 (Fed.Cir.1987) (*aff'g mem. Chabal v. Dep't of Justice*, Nos. PHO7528610029 and PH34438510740 (MSPB Nov. 19, 1985) (initial decision), *review denied*, 30 M.S.P.R. 499 (MSPB 1986)). The district court also rejected Chabal's first amendment claim, ruling that under *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), Chabal's statements to his superiors regarding the internal operations of the Marshals Service, and its responsibilities to the federal judges of his district, did not constitute protected activity under the first amendment. Chabal has not pursued either the first amendment claim or the statutory claim on appeal. For our purposes, Chabal alleges that his removal deprived him of liberty and property without due

process of law in violation of the fifth amendment.

## II.

Almost a century ago, in *In re Neagle*, 135 U.S. 1, 63, 10 S.Ct. 658, 34 L.Ed. 55 (1890), the Supreme Court recognized that United States Marshals "are appointed by the President ... [and] are removable from office at his pleasure." Every court to address the issue since then has reached the same conclusion. Although the Constitution does not expressly assign the President the power to remove subordinate federal officers, it has long been settled that such a power is implicit in Article II. Among the executive powers vested in the President by Article II is the power, with the advice and consent of the Senate, to appoint "all ... Officers of the United States, whose Appointments are not ... otherwise provided for" by the Constitution. The Supreme Court has long held that "[i]n the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment." *Keim v. United States*, 177 U.S. 290, 293, 20 S.Ct. 574, 575, 44 L.Ed. 774 (1900); *accord Myers v. United States*, 272 U.S. 52, 161, 47 S.Ct. 21, 40, 71 L.Ed. 160 (1926); *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 259, 10 L.Ed. 138 (1839); *see also Kalaris v. Donovan*, 697 F.2d 376, 389 & n. 54 (D.C.Cir.), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983). The power of removal also inheres in the President's power and responsibility to "take Care that the Laws be faithfully executed." *See Nixon v. Fitzgerald*, 457 U.S. 731, 750, 102 S.Ct. 2690, 2701, 73 L.Ed. 2d 349 (1982); *Myers*, 272 U.S. at 164, 47 S.Ct. at 41.

The scope of the President's power of removal is defined by three Supreme Court decisions: *Myers, Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), and *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed. 1377 (1958), known as the *Myers–Humphrey's Executor–Wiener trilogy*. Taken together, these cases establish two principles that we think independently dispose of Chabal's claim. The first is that if a federal officer discharges purely executive powers, the President's power to remove the officer is absolute; Congress cannot constitutionally restrain the President from removing such an officer. The second is that if the federal officer's functions are not purely executive, Congress has the constitutional authority to condition his removal from office, but the President's power of removal is unimpaired unless Congress chooses to restrict it.

In *Myers*, the Court upheld the inherent right of the President to discharge a postmaster in the face of congressional legislation purporting to limit the President's removal authority. The Court endorsed the view that Congress cannot interfere with the President's performance of his constitutional duty to take care that the laws be faithfully executed by curtailing his control over the subordinates whom he has appointed to assist him in that task. *Myers*, 272 U.S. at 162–64, 47 S.Ct. at 40–41. Thus, regardless of statutory provisions to the contrary, officers exercising purely executive powers are removable at will by the President.

In *Humphrey's Executor*, the Court sustained the constitutionality of a "for cause" restriction on the President's authority to remove commissioners of the Federal Trade Commission. The Court reasoned that, in contrast to the postmaster in *Myers*, the FTC commissioners exercised "quasi-judicial" and "quasi-legislative" powers and were "wholly disconnected from the executive department." *Humphrey's Executor*, 295 U.S. at 624, 628–30, 55 S.Ct. at 872, 874–75. The Court therefore concluded that the "for cause" limitation would not interfere with the President's constitutional duty to execute the laws.

The Court reached a similar conclusion in *Wiener*, in which it upheld a wrongful discharge claim by a commissioner of the War Claims Commission who had been removed by President Eisenhower. The Court reasoned that, as in *Humphrey's Executor*, the commissioner did not perform executive tasks. Rather, the War Claims Commis-

sion performed adjudicative duties in resolving claims presented to it. Although the enabling legislation, the War Claims Act of 1948, did not expressly limit the President's removal power, the Court inferred that Congress intended the Commission's members to be free from the prospect of removal at will because the governing legislation precluded the President from influencing the adjudication of any particular claim. This demonstrated a basic congressional purpose of insulating the Commission's members from the President's authority. *Wiener,* 357 U.S. at 356, 78 S.Ct. at 1279.

Although *Humphrey's Executor* and *Wiener* each upheld a congressional limitation on the President's removal power, both decisions reiterate that the President enjoys "the unrestrictable power ... to remove purely executive officers." *Humphrey's Executor,* 295 U.S. at 632, 55 S.Ct. at 875; *Wiener,* 357 U.S. at 352, 78 S.Ct. at 1277. Equally important, both decisions make clear that the President's plenary power of removal does not lapse simply because an officer's functions are other than purely executive; instead, the question then is whether Congress intended to restrict the President's removal authority in the particular situation. *See, e.g., Humphrey's Executor,* 295 U.S. at 623–25, 55 S.Ct. at 872–73.

In light of *Myers, Humphrey's Executor,* and *Wiener,* when a federal officer like Chabal claims a right to retain his office in the face of a decision by the President to remove him, the officer must make not one, but two showings. He must show that he does not exercise purely executive powers, for otherwise the President's power to remove him is absolute. If he succeeds in his first task, he must then demonstrate that Congress in fact has exercised its authority to limit the President's power of removal. A failure to show either element is fatal. Chabal has shown neither.

### III.

We reject Chabal's notion that because United States Marshals are assigned to the federal courts, they are not members of the executive branch, and hence do not come under the teachings of the *Myers–Humphrey's Executor–Wiener* trilogy.

### A.

United States Marshals are officers of the Department of Justice. 28 C.F.R. § 0.5(a). They are appointed by the President, with the advice and consent of the Senate, and are placed by statute under the supervision and direction of the Attorney General. 28 U.S.C. §§ 561(a), 569(c). The Attorney General oversees the activities of the marshals through the United States Marshals Service, a bureau of the Department of Justice. 28 C.F.R. § 0.1.

Marshals are vested by statute and regulation with a variety of responsibilities, all of which involve the execution and enforcement of federal law. They are responsible for ensuring federal courtroom security, executing various aspects of the federal witness protection program, and providing security to government witnesses and their families who are under threat of violence because of their testimony. 28 C.F.R. § 0.111(c). They control the custody and disposition of assets seized by the Department of Justice in connection with criminal investigations and administer the Department's Asset Forfeiture Fund. 28 C.F.R. § 0.111(i). Marshals have various responsibilities for the detention and transportation of federal prisoners. *Id.* § 0.111(j)-(k). They execute federal arrest warrants and are authorized to obtain search warrants as well. 18 U.S.C. § 3053; 28 C.F.R. § 60.3. They also have investigative and enforcement responsibilities concerning the apprehension of fugitives. 28 C.F.R. § 0.111(q). They are responsible for providing law-enforcement assistance in the event of civil disturbances, terrorist incidents, and hostage situations. U.S. Marshals Serv., U.S. Dep't of Justice, *The Office of the United States Marshal* 14 (1981). In addition, they provide security assistance to the military in connection with off-base movements of weapons systems. *Id.* As noted, their discharge of these responsibilities is sub-

ject to the direction and supervision of the Attorney General.

All of the marshals' responsibilities, from executing arrest warrants to providing courtroom security, protecting federal witnesses, and guarding military weapons movements, come squarely within the realm of federal law enforcement. Accordingly, it has long been settled that marshals are officers of the executive branch.

### B.

As early as 1890, the Supreme Court ruled that "marshals of the United States ... belong emphatically to the executive department of the government." *In re Neagle,* 135 U.S. 1, 63, 10 S.Ct. 658, 34 L.Ed. 55 (1890). The Court has since reiterated that "Marshals are within the Executive Branch of the Federal Government, ... subject to the supervision and direction of the Attorney General ... [and] funded through Department of Justice appropriations." *Pennsylvania Bureau of Correction v. United States Marshals Serv.,* 474 U.S. 34, 36 n. 1, 106 S.Ct. 355, 358 n. 1, 88 L.Ed.2d 189 (1985). In *Pennsylvania Bureau of Correction,* the Court affirmed our decision that federal district courts lack the authority to direct United States Marshals to transport state prisoners from state jails to federal courts. The Court's decision rests squarely on the premise that marshals are officers of the executive branch and that federal courts, therefore, may direct their actions only when pursuant to express statutory authority. *See Pennsylvania Bureau of Correction,* 474 U.S. at 38–43, 106 S.Ct. at 359–61.

We thus conclude that, as officers of the executive branch, with wide-ranging law enforcement responsibilities, marshals are "purely executive" officers within the intendment of *Myers, Humphrey's Executor,* and *Wiener.* Perhaps the most fundamental of the President's powers (and duties) under Article II is the execution of federal law. When an officer appointed by the President executes and enforces the laws, as does a United States Marshal, he is performing a quintessentially executive function. The authority of the Attorney

General to direct the activities of the marshals simply underscores the executive nature of the marshals' tasks. As a result, the President enjoys an absolute right to remove the marshals from office at will.

Our research discloses no court decision to the contrary. In *In re Neagle,* the Supreme Court acknowledged that marshals "are appointed by the President ... [and] are removable from office at his pleasure." 135 U.S. at 63, 10 S.Ct. at 668. In *Farley v. United States,* 139 F.Supp. 757, 758, 134 Ct.Cl. 672 (1956), the Court of Claims held that "a United States Marshal is an executive officer whose duties are ministerial and purely executive, and therefore he can be removed at the pleasure of the President prior to the expiration of the statutory term of office." In *Martin v. Tobin,* 451 F.2d 1335, 1336 (9th Cir.1971), the Court of Appeals for the Ninth Circuit likewise held that "a U.S. Marshal is a purely executive officer and the President can remove him at any time." Both *Farley* and *Martin* rejected claims by former marshals that their removal from office by the President exceeded the President's powers.

Nothing in *Ex parte Siebold,* 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1879), relied upon by the appellant, is to the contrary. *Siebold* expressly acknowledges that the marshal "is an executive officer." *Id.* at 397. Although *Siebold* also states that a marshal is an "officer of the courts," *id.,* that characterization in no way derogates the President's removal power, as the Supreme Court's subsequent discussion in *Neagle* shows. United States Attorneys are no less "officers of the court" than are the marshals (*see, e.g., United States v. Bayhn,* 696 F.2d 1030, 1045 (3d Cir.1982)), but it can hardly be suggested that they are not "purely executive" officers or that the President lacks the plenary authority to remove them. *See Parsons v. United States,* 167 U.S. 324, 17 S.Ct. 880, 42 L.Ed. 185 (1897) (recognizing President's plenary power to remove U.S. Attorney prior to expiration of attorney's four-year term).

We recognize the dictum contained in *Siebold* that under the appointments clause, Congress might vest the appoint-

ment of marshals elsewhere than in the hands of the President. *Siebold*, 100 U.S. (10 Otto) at 397. Yet, it does not follow from this dictum that Congress has the right, or has exercised the right, to restrict the President's power of removal. Indeed, in *Myers*, the Court explicitly held that even when Congress has the power under the appointments clause to vest appointments in hands other than the President's, "so long as Congress does not exercise that power, the power of removal must remain where the Constitution places it, with the President, as part of the executive power." *Myers*, 272 U.S. at 161, 47 S.Ct. at 40.

### C.

Chabal's basic argument against recognizing the President's plenary removal power is that marshals provide a variety of services for the judiciary, some of them arguably essential to the functioning of the courts, and hence the Marshal's office is not merely executive, but quasi-judicial as well. This argument, however, confuses the question of who benefits from the marshals' law enforcement activities with the question of whether those activities involve executive power.

When a marshal arrests a felon pursuant to a judicial warrant or protects federal judges from assaults in the courtroom, he is executing and enforcing federal laws. The character of his actions is not changed because interests of federal judges, both personal and institutional, are advanced by those actions. What removed the federal officers in *Humphrey's Executor* and *Wiener* from the scope of the President's "unrestrictable power" of removal under Article II, *Humphrey's Executor*, 295 U.S. at 632, 55 S.Ct. at 875, was that the officers themselves were vested with what the Court there deemed legislative and judicial powers. *See id.* at 624, 55 S.Ct. at 872; *Wiener*, 357 U.S. at 354–55, 78 S.Ct. at 1279; *compare Morgan v. TVA*, 115 F.2d 990 (6th Cir.1940), *cert. denied*, 312 U.S. 701, 61 S.Ct. 806, 85 L.Ed. 1135 (1941) (recognizing plenary power of President to remove chairman of TVA's board of directors because, *inter alia*, board did not

exercise adjudicatory powers). Marshals enjoy no such powers. Their office is to enforce the laws, no more and no less.

That assistance provided the judiciary by marshals includes the enforcement of judicial orders in no way alters the executive character of the marshals' duties. All members of the executive branch are subject to the orders of the federal courts, and the most senior members of the executive, including the President himself, can be called upon to enforce those orders. *See, e.g., United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). This does not transform those executive officers into something else, removing them from the scope of the President's plenary removal power under Article II. Moreover, if Chabal is correct that an officer of the executive branch takes on a quasi-judicial character when he enforces judicial orders, then by the same logic, an executive officer takes on a quasi-legislative character when he enforces acts of Congress. Under that reasoning, the Attorney General himself is not a "purely executive" officer for purposes of *Myers*, since his principal responsibility is to enforce federal statutes, and Congress can restrict the President's power to remove him as it chooses. There can be no question that this would eviscerate the President's constitutional removal power.

Ultimately, Chabal's argument assumes that the Framers could not have intended the judiciary to be dependent on an independent executive for the vindication of its orders. But the Framers contemplated precisely that result. Alexander Hamilton observed in *The Federalist*, in explaining why the federal judiciary would be the "least dangerous" branch, that "[t]he judiciary ... must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments." *The Federalist* No. 78, at 490 (B. Wright ed. 1961). More generally, as we have recognized, "[t]he protection from abuse of power which the separation[-of-powers] concept seeks to provide is not compromised by a necessary degree of cooperation between the three branches." *In re President's Comm'n on Organized Crime Subpoena*, 783 F.2d 370, 379 (3d Cir.1986).

[T]he Constitution does not require, or envision, total separation of each of the three essential branches. Only if they function independently within their separate areas, but cooperatively in their relations with each other, may the government, as a whole, perform its constitutional role. Each separate gear must carry out its assigned task while meshing with the others so that power is delivered where needed. The Constitution "enjoins upon [the government's] branches separateness but interdependence, autonomy but reciprocity."

*Id.* at 375 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)).

The choice posed by Chabal, that of either denying the President plenary removal power or consigning the courts to a fatal lack of power to protect their mandates, is a false one. Two hundred years of history show that the President's plenary power to remove marshals from office has not jeopardized the independence and authority of the courts. Nothing about this case suggests a different conclusion. The separation-of-powers doctrine does not shield marshals from removal by the President at will.

## D.

The statutory provisions governing the office of marshal support our analysis. Section 561(a) of Title 28 provides for the President to appoint one marshal for each judicial district, with the advice and consent of the Senate. Section 561(b) provides that each marshal shall serve a term of four years and shall remain in office until his successor is appointed, "unless sooner removed by the President." Section 576, added by Congress in 1984, provides certain post-removal rights for persons who (unlike Chabal) were appointed to the office of marshal from subordinate positions in the Marshals Service (the "competitive service"). These post-removal rights are expressly limited to removal "for reasons other than misconduct, neglect of duty, or malfeasance." 28 U.S.C. § 576(a). But

even if Chabal qualified for the rights provided in section 576(a), which he does not because he was not appointed "from a position in the competitive service," he would not be entitled to the post of marshal, but to "any vacant position in the competitive service ... at the same grade or pay level" that the individual served prior to his appointment as marshal. 28 U.S.C. § 576(a). Section 576(b) parallels section 561 and provides that any marshal serving at the time of its enactment "shall continue to serve for the remainder of [his] term ... unless sooner removed by the President."

Certain things are clear about these provisions. First, by providing that marshals serve for designated terms "unless sooner removed by the President," the legislation confirms that Congress meant for the President to retain the power to remove marshals. Second, the legislation nowhere cabins the President's removal authority in terms of removal "for cause," as the Federal Trade Commission Act was found to do in *Humphrey's Executor.*

The conclusion that Congress has not attempted to restrict the President's removal authority is reinforced by Congress's express decision to subject marshals to the supervision and direction of the Attorney General, the executive branch's principal legal officer and himself answerable directly to the President. *See* 28 U.S.C. §§ 526(a)(1), 569(c) (providing for the Attorney General to "supervise and direct United States Marshals in the performance of [their] public duties" and authorizing him to "investigate the official acts" of marshals); *see also Pennsylvania Bureau of Correction*, 474 U.S. at 36 n. 1, 106 S.Ct. at 358 n. 1 (marshals are subject to the supervision and direction of the Attorney General). In both *Humphrey's Executor* and *Wiener*, the Supreme Court concluded that Congress had intended to protect the officers involved from plenary removal because Congress demonstrated a more general intent to insulate their agencies from executive-branch oversight and influence. *See Humphrey's Executor*, 295 U.S. at 625, 55 S.Ct. at 873 (Congress intended for the FTC "to be 'separate and apart from

any existing department of the government —not subject to the orders of the President.' "); *Wiener,* 357 U.S. at 355–56, 78 S.Ct. at 1279 (War Claims Commission intended to be free from direct or indirect control of either the Executive or Congress). The contrast in this case, where the United States Marshals Service is a branch of the Department of Justice and the marshals themselves are placed by statute under the direction of the Attorney General, is self-evident.

### IV.

All of the foregoing is but prelude, but an important prelude, to the overarching question presented here. Did Chabal have a property or liberty interest in his position as United States Marshal that would preclude the President from removing him from office?

### A.

█ For Chabal to prevail in his property interest contention, he must first allege and prove that he possessed a property interest in his office. To have a property interest in a job, a person must have more than a unilateral expectation of continued employment; he must have a legitimate entitlement to it. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). As we have demonstrated, a United States Marshal does not possess a property right in his position. The terms of the governing statutes, 28 U.S.C. §§ 561(a), (b), 576(a), (b), make clear that Congress contemplated the right of the President to remove a marshal at will.

Thus, Chabal had no legitimate entitlement to continued employment. Accordingly, Chabal lacked a property interest in his office that would trigger the procedural protections of the due process clause.

### B.

█ We now turn to Chabal's liberty interest contention. The district court determined, and we agree, that Chabal has failed to plead the prerequisites of a valid liberty interest claim. This court has stated that

> [a]n employment action implicates a [protected] liberty interest only if it (1) is based on a 'charge against [the individual] that might seriously damage his standing and associations in the community ..., for example, [by implying] that he had been guilty of dishonesty, or immorality,' or (2) 'impose[s] on him a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities.'

*Robb v. City of Philadelphia,* 733 F.2d 286, 294 (3d Cir.1984) (citations omitted). Moreover, a plaintiff must plead that the allegedly stigmatizing information was "published" or otherwise disseminated by his government employer to the public. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). Here, Chabal has shown neither that his removal stigmatized him nor that the reasons for his removal were disseminated to the public.

Chabal cannot conceivably show that he was "stigmatized" by his removal. According to Chabal, he was removed for acting on his belief that he was duty-bound to follow the directives of the judges of his district rather than the contrary orders of his superior in Washington App. at 92–95. Removal for that reason by no stretch of the imagination can be considered stigmatizing; it does not disparage Chabal's "good name, reputation, honor, or integrity." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). As we held in *Robb,* a liberty interest claim cannot be asserted when the plaintiff "alleges no facts that would suggest that the [employment decision was] based on any charge of immorality," or would adversely affect his future employment opportunities. *Robb,* 733 F.2d at 294.

Even if Chabal had been removed for reasons that reflected adversely on his character, he has not alleged that the defendants publicly disseminated the reasons for his removal. Indeed, Chabal asserts that he himself was never informed of those reasons. App. at 88a. We have

made it clear that a protected liberty interest is not implicated if the government did not in fact disseminate any allegedly stigmatizing information to the public. In *Bishop*, the Court expressly held that no deprivation of liberty under the due process clause arises from "the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge." *Bishop*, 426 U.S. at 348, 96 S.Ct. at 2079; *accord Cohen v. City of Philadelphia*, 736 F.2d 81, 83 n. 5 (3d Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984); *Cooley v. Pennsylvania Hous. Fin. Agency*, 830 F.2d 469, 473–74 (3d Cir.1987).

Thus, the district court correctly regarded as dispositive that Chabal "makes no allegation whatsoever that the government communicated to the general public any information regarding the reasons for his dismissal or in any other manner disparaged his name." App. at 113. We must conclude that Chabal's dismissal in no way violated a constitutionally protected liberty interest.

## V.

This, too, must be said. We decide this appeal on the basis of what we consider settled law regarding the President's right to remove a United States Marshal. But we also believe that the allegations made by Chabal in his complaint concerning the conduct of Chief Deputy Richard Reynolds are serious enough to command the attention of John J. Gibbons, Chief Judge of the Judicial Council of the Third Circuit. The Council is charged with making "all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332. This court is faced with an allegation by Chabal that he was removed from office after he reported to his superiors that Chief Deputy Reynolds had violated the marshals' responsibility of "to attend the court and serve process." Reply Br. for appellant at 7. The conduct of Chief Deputy Reynolds, if true, would be a serious impediment to "the effective and expeditious administration of justice." The record before us discloses that Judge Malcom Muir complained to appellee Stanley Morris, Director of the Marshal's Service, that Reynolds' conduct was "disrespectful," and "[a] willful defiance of a court order," that Reynolds had "accosted the Chief Judge [William J. Nealon] as the judge was leaving the bench," and that, at another time, Reynolds "stated that Judge [Richard P.] Conaboy didn't know what he was doing and instructed deputy marshals not to carry out an order of Judge Conaboy...." App. at 137a–38a. The record also includes a letter to Chabal from Chief Judge Nealon which relates that Chief Deputy Reynolds had delivered to Judge Nealon's chambers a bill for $25.20 for service of process fees. In returning the statement to Chabal, Chief Judge Nealon stated that, "[i]n my twenty-two years as a federal judge I have never had a similar request." App. at 149a. We think these allegations are serious enough to have the complaints against Reynolds thoroughly investigated by the Office of Internal Affairs of the United States Marshals Service, and a copy of the investigation report, together with a statement of disciplinary action taken, if any, sent to Chief Judge Gibbons to determine if any action should be taken by the Judicial Council. We are confident that no order of this court or the Third Circuit Council is necessary because we feel certain that the Marshal's Service will be most willing and generous to undertake such an investigation and to prepare a report for the Council concerning the activities of Chief Deputy Reynolds from December 11, 1984, to date.

## VI.

The judgment of the district court will be affirmed.