Dr. H. Major POTEAT, Plaintiff,

v.

HARRISBURG SCHOOL DISTRICT; Marion Gray, Barton Fields, Francis B. Haas, Calobe Jackson, Ken Lester, Joseph C. Brown, as members of the Board of School Directors of the Harrisburg School District, in their individual and official capacities; Defendants.

No. Civ.A. 1:CV–98–0016.

United States District Court, M.D. Pennsylvania.

Jan. 21, 1999.

Christopher R. Booth, Singley & Associates, Philadelphia, PA, for Plaintiff.

David B. Dowling, Robert J. Tribeck, James P. Ellison, Rhoads & Sinon LLP, Harrisburg, PA, for Defendants.

*MEMORANDUM*

CALDWELL, District Judge.

I. *Introduction.*

We are considering the Defendants' motion for summary judgment. The Plaintiff, Dr. H. Major Poteat, was the superintendent of the Harrisburg School District, employed under a written agreement. The Defendants are the school district; Marion Gray, the

president of the Board of School Directors; and Barton Fields, Francis B. Haas, Calobe Jackson, Ken Lester, and Joseph C. Brown, members of the Board. The individual Defendants have been sued in their individual and official capacities. Nathan Waters, Jr., the solicitor for the School District and the Board, was also a Defendant, but as noted below, he has been dismissed from the action.

II. *Procedural History.*

In his complaint, the Plaintiff made the following federal and state claims. In count I, he averred that the Defendants violated his first amendment rights and his rights to substantive and procedural due process when they interfered with his employment agreement and the performance of his duties as superintendent. In count II, he alleged a claim under 42 U.S.C. § 1985(3). In count III, he alleged a claim for breach of contract, asserting among other things, that the Defendants had disguised an adverse job action controlled by paragraph 12 of the employment agreement as a dissolution of the agreement under paragraph 13. In count IV, he averred that Defendant Waters, the board solicitor, had intentionally interfered with Plaintiff's contractual relationship with the Board. In count V, the Plaintiff asserted a defamation claim for allegedly false and defamatory statements made about him in the months leading up to his discharge. In Count VII (there is no count VI), the Plaintiff made an "invasion of privacy/false light" claim, alleging that the statements placed him in a false light in the public eye. Finally, in count VIII, the Plaintiff alleged that the Defendants breached fiduciary responsibilities to him.

The Defendants filed a motion to dismiss some of the claims. By memorandum and order, dated May 26, 1998, we granted most of the motion. Count II, the section 1985(3) claim, count III, the contract claim, count IV, the claim against Defendant Waters for intentional interference with contract, and count VIII, the claim for breach of fiduciary duty, were dismissed in their entirety. In count I, the claim for punitive damages as against the School District and the individual

Defendants in their official capacities was dismissed. Count V, the defamation claim, and count VII, the "invasion of privacy/false light" claim, were dismissed against the Defendant School Board and Defendant Waters.

As a result, the only claims left in the case were: (1) the claims in count I against the School District and the school board members for violations of the Plaintiff's first amendment rights and his rights to procedural and substantive due process; (2) the claim for defamation in count V; and (3) the claim for "invasion of privacy/false light" in count VII. The latter two claims were retained only against the school board members, thus leaving Defendant Waters out of the case entirely.

The Defendants' motion for summary judgment is directed at these remaining claims. We will evaluate the motion under the well established standard. *See Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 536 n. 3 (3d Cir.1994). That standard allows summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693–94 (3d Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

With this standard in mind, we set forth the summary-judgment background to this litigation, construed in the light most favorable to the Plaintiff.

III. *Background.*

Poteat began his employment with the School District on July 1, 1984, as principal of John Harris High School, a position he held through 1990. In 1988, he also became director of secondary education. From 1991 through 1995, he was assistant superintendent of the School District.

In June 1995, the Board promoted him to superintendent. On June 30, 1995, Poteat and the Board executed a written employment agreement (Defendant's exhibit A), to begin on July 1, 1995, and to run for five years. Under paragraph 21, the agreement is to be construed under Pennsylvania law.

The agreement contains the following provisions pertinent to this action. Paragraph 3 sets forth the superintendent's duties. Basically, he carries out Board policy and runs the daily operation of the School District subject to the oversight of the Board.

Paragraph 11, under the caption "Evaluation," requires the Board to evaluate Poteat once a year and submit a written report to him, including a specific description of any unsatisfactory performance. Poteat would then have a year to correct any deficiency, and if no "employment action" had been taken against Poteat, the evaluation and response would be removed from his personnel file, if placed there.

Paragraph 12, captioned "Suspension or Termination of Employment," provides, in pertinent part:

(a) Subject to the terms herein, any suspension, or termination or job action against DR. POTEAT shall be with pay and benefits until the final appellate court of competent jurisdiction shall have made a final decision, i.e., until all appeals have been exhausted or waived. Notwithstanding the preceding sentence, all pay and benefits shall only continue twenty-four months from the date of such suspension, termination or job action, but not to exceed the expiration of this employment agreement. The SCHOOL DISTRICT shall issue a written decision on the suspension, termination or job action within one hundred twenty days of the date of the job action.

(b) Subject to Paragraph 11 hereinabove, DR. POTEAT's employment may only be suspended, terminated or other job action may be taken by the BOARD for breach of the duties set forth in Paragraph 3 hereinabove, upon sixty (60) days notice in writing. In any job action, DR. POTEAT is entitled to any and all rights available under the Local Agency Law,

The Public School Code of 1949, as amended; and has the right to appeal said job action to a court of competent jurisdiction and to the appellate courts, if necessary.

Paragraph 13, captioned "Settlement of Agreement," states as follows, in pertinent part:

If at any time THE BOARD wishes to amicably dissolve this agreement, it may do so by compensating DR. POTEAT the lesser of (a) four times his annual salary in effect at the time the agreement is dissolved, or (b) the difference between five years and the number of years actually served by DR. POTEAT pursuant to this agreement to the date of such dissolution, multiplied by DR. POTEAT's annual salary in effect at the time the agreement is dissolved. Notwithstanding the preceding sentence, in the last year of this employment agreement, DR. POTEAT shall be entitled to two times his annual salary in effect at the time the employment agreement is dissolved. In either event, DR. POTEAT shall have a right to receive a lump sum payment which shall be due and payable the last day of actual work performed under this agreement or pursuant to a payment schedule in any other manner mutually agreed upon by THE BOARD and DR. POTEAT.

(Defendants' Exhibit A).

In December 1995, Defendants Gray, Haas, and Fields, recently elected, were new members of the Board. Together with Defendants Jackson and Lester, they formed at times a five-person majority on the nine-member Board. According to the Plaintiff the new members of the Board were hostile to him.

Beginning in 1996, disagreements arose between Poteat and the Defendant board members. In both 1996 and 1997, Poteat disagreed with the budget committee, consisting of Defendants Gray, Haas, and Fields, about certain cuts the latter wanted to make in the school district budget for the fiscal years 1996–97 and 1997–98. The cuts would have allowed the furloughing of teachers and administrative staff. The cuts in 1997–98 were about $800,000. Poteat had also objected to cuts in the K–4, K–5 and the Arts Magnet School.

The Plaintiff believed that the cuts violated the School Code because, in his view, they were being implemented to save money rather than because they were directed at ineffectual educational programs. He thought that educational programs should not be jeopardized and that teacher contracts should not be broken solely for economic reasons. He expressed his views orally and in writing. Citing 24 P.S. § 11–1124, Waters, the board solicitor, responded that the School Code allowed employees to be suspended for certain reasons and that teachers who felt aggrieved had the right to challenge their suspensions.

Defendant Fields testified that the cuts had been made because Poteat had initially indicated that the affected programs were not effective educationally, although the Plaintiff later backtracked from this position. Fields was upset by this midstream change.

Poteat yielded to the pressure to make the cuts. As a result, the teachers' union filed a grievance for the fiscal year 1996–97. The Board settled the grievance for $100,000 when Poteat told the Board attorney shortly before a hearing that he would have to testify that the cuts were made solely for an improper economic motive. In April 1997, when Poteat made his objection to the cuts for the fiscal year 1997–98, the discussion became "heated" but Plaintiff "stood his ground."

Defendants Haas, Fields and Gray never met with the Plaintiff to discuss any goals or objectives to be achieved by him. Plaintiff attributed this to hostility toward him. Defendant Haas attributed this to an inability of the Board itself to agree on goals, although he admitted that he had concerns about Poteat's ability to perform as superintendent. Haas believed he could not do the job entirely by himself. In fact, Haas and other board members suggested to Poteat that he hire an assistant. Defendant Gray even recommended that Poteat hire her sister. Haas was aware of a Cooper & Lybrand report rejecting the idea of an assistant, but nonetheless made the recommendation.

Although individual board members recognized that the Plaintiff was contractually entitled to an annual written evaluation, they never evaluated the Plaintiff and did not advise him of deficiencies in his performance.

In June 1997, rumors surfaced about a grade-changing scandal in the District. Supposedly, grades were being changed so that students who did not qualify for graduation could graduate from high school, and that the Plaintiff either knew about it or ordered it. The Plaintiff conducted his own one-week investigation and concluded that less than 10 students had been allowed to graduate without meeting grade requirements. He recounted this at a regular meeting of the School Board held on June 19, 1997. He also reported that he had not been involved in changing grades.

At the same meeting, with the Defendant board members making up the majority, the Board decided to conduct its own investigation. Defendant Gray, the board president, made comments from a prepared statement. In pertinent part, the third paragraph of the statement said that Poteat should be on leave while the investigation was going on and that "[n]o decisions or determinations have been made by the School Board whether the allegations have merit, or whether Dr. Poteat has engaged in any improper conduct and no one should interpret my recommendation as an indication that any decisions about the allegations have been made." (Defendants' exhibit D) (brackets added). The Board did not vote to suspend Poteat.

Dr. Poteat also read from a prepared statement, publicly addressing why students in the District were consistently below national averages and were performing poorly in the classroom. His solution to these problems was that the students' parents and the community must get more involved and hold everyone accountable, specifically mentioning administrators and teachers. He made no mention of the Board, any member of the Board, or any board policy. (Attachment to Defendants' exhibit E).

The Board hired Michael Levin, an attorney experienced in school law, to conduct the investigation. On June 27, 1997, Levin wrote a letter to the Board indicating he understood his assignment to be an investigation of the grade-changing matter but that he would report on any other improper conduct he noted in the course of that investigation. (Defendants' exhibit K). Levin interviewed the Plaintiff, members of the School Board, teachers and administrators in the District, and members of the public. In August 1997, Poteat's attorney was notified that Levin was representing the Board in negotiations over the potential termination of Poteat's employment agreement.

On September 24, 1997, some three months after he had been retained, Levin submitted a 12–page report to the Board, which the Board made public. In pertinent part, the report contained the following statements. In the introduction, Levin noted the bad feelings that surrounded his investigation:

> Those who support Dr. Poteat, for example, called this a "witch hunt." Those who mistrust the School District believe that this investigation will be a "whitewash." We have heard that some of Dr. Poteat's detractors indicate that his supporters want to cover up economic advantages to themselves, nepotism, and even sexual relationships.

(Defendants' exhibit L at page 3).

In the body of the report, Levin noted:

1. For years grades had indeed been changed but for a variety of reasons, some valid, some not;

2. The grades were changed by administrators and teachers;

3. Poteat was not involved in any grade changing;

4. However, Poteat had issued a policy allowing promotion that was inconsistent with board policy;

5. Further, Poteat had allowed principals to interpret this policy individually;

6. Poteat had implemented a summer school program that was inconsistent with board policy; and

7. While [m]any of the allegations against Dr. Poteat with respect to his involvement in "grade-gate" [were] "unfounded," he had "permitted an environ-

ment to exist where subordinates did not adhere to School Board policies or Superintendent Circulars."

(Defendants' exhibit L at pps. 5, 7, 10 and 11) (brackets added).

On occasion, the Defendant school board members had criticized Poteat or at least expressed concern about the ballooning costs of a proposed new high school, transportation problems, scheduling problems, and the inflation of student enrollment figures. Defendant Haas heard from someone that Defendant Lester had said that Plaintiff had been arrested for embezzling funds. However, the Plaintiff himself could not attribute these rumors to any board member.

At one point during Poteat's tenure as superintendent, he ordered that Reamus Jones, a local contractor, not be paid for an invoice Jones had submitted for some work he had done at one of the high schools because Jones had already been paid in full. According to Plaintiff, Defendant Gray ordered that the invoice be paid anyway.

On December 1, 1997, the Board voted to dissolve the employment agreement. The dissolution was not on the Board's agenda for the meeting and, although it had been discussed by individual board members previously, at no time before this meeting did the full Board meet and discuss ending Poteat's tenure as superintendent. In accordance with paragraph 13, Poteat was paid $326,-841.86, the amount due him under the lump-sum provision of that paragraph.

## IV. *Discussion.*

### A. *The Procedural Due Process Claim.*

The fourteenth amendment protects a person from state action that deprives him of life, liberty or property without due process of law. If the fourteenth amendment applies to Poteat, then his right to due process was violated because the Board dissolved his employment agreement without complying with the core requirements of due process either before or after the dissolution; that is, notice of their intent to end the agreement and an opportunity for him to be heard before they did so.

However, for the fourteenth amendment to apply here, Poteat must establish that he had either a liberty or a property interest in his employment. If he cannot establish either kind of interest, then his due process claim must fail. *See Abbott v. Latshaw,* 164 F.3d 141, 146 (3d Cir.1998) ("It is elementary that procedural due process is implicated only where someone has claimed that there has been a taking or a deprivation of a legally protected liberty or property interest."); *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1395 (3d Cir.1991).

■ A liberty interest can arise either from the federal constitution or from state law. *See Layton v. Beyer,* 953 F.2d 839, 842 (3d Cir.1992). A property interest, on the other hand, arises only from state law. *See Larsen v. Senate of the Commonwealth of Pennsylvania,* 154 F.3d 82, 92 (3d Cir.1998), *petition for cert. filed,* No. 98–988 (U.S. Dec. 17, 1998).

Poteat presents three arguments in support of his procedural due process claim. First, he contends that he had a property right in his employment created under state law by two provisions of the School Code requiring that professional employees of a school district have a contract that allows termination only for specified causes. *See* 24 P.S. §§ 11–1121 and 11–1122 (Purdon or Purdon Supp.1998–99).

■ An employment contract with a public entity terminable only for cause can represent a property interest, *see Unger, supra,* 928 F.2d at 1399, but we reject this argument. As pointed out by the Defendants, the Plaintiff's contract with the Board was not governed by the cited provisions of the School Code because the Plaintiff does not qualify as a "professional employe" as that term is defined in the School Code.[1] More-

---

1. In relevant part, 24 P.S. § 11–1101(1) defines a "professional employe" as:

 those who are certificated as teachers, supervisors, supervising principals, principals, assistant principals, vice-principals, directors of vo-

cational education, dental hygienists, visiting teachers, home and school visitors, school counselors, child nutrition program specialists, school librarians, school secretaries the selec-

over, the superintendent is supposed to rate professional employees, *see* 24 P.S. § 11–1123, and he would not be assigned the task of rating himself.

Second, the Plaintiff contends that he had a property right arising from the provision of his employment agreement (identified by Poteat in his brief as paragraph 8 but appears to be paragraph 11) requiring the Board to evaluate Poteat once a year, submit a written report to him which would include a specific description of any unsatisfactory performance, and allowing Poteat a year to correct any deficiency. Presumably, this clause acts like a provision allowing discharge only for cause and hence qualifies as a constitutionally protected property right.

We reject this contention because, as the Defendants point out, it ignores paragraph 13 of the agreement, which allowed the Board, "at any time" to dissolve it (and thereby discharge Plaintiff as superintendent) upon the payment of a certain sum of money. As we have already decided in disposing of the motion to dismiss, the Board could exercise this right without regard to any other provisions of the agreement, and in fact did so in this case, paying Poteat the amount due under the lump-sum option of paragraph 13. *See Poteat v. Harrisburg School District*, No. 1:CV–98–16, slip op. at 21–23 (M.D.Pa. May 26, 1998)(specifically discussing whether paragraph 13 trumped paragraph 12, the provision dealing with a "job action," including a specific job action like a suspension or termination).[2]

In connection with these two due process claims, we also agree with the Defendants that the only process that was due Poteat was the payment required by his employment agreement. *See Harris v. Board of Education*, 105 F.3d 591 (11th Cir.1997); *Royster v. Board of Trustees*, 774 F.2d 618 (4th Cir.1985); *Cannon v. Beckville Independent School District*, 709 F.2d 9 (5th Cir.

1983); *Harrington v. Lauer*, 888 F.Supp. 616 (D.N.J.1995).

We further note that the Plaintiff's reliance on *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), is misplaced. *Loudermill* requires a pretermination hearing only for employees who could not be fired except for cause. *See also Gilbert v. Homar*, 520 U.S. 924, 929, 117 S.Ct. 1807, 1811, 138 L.Ed.2d 120, 126 (1997). Poteat had no such right.

Third, the Plaintiff contends that he had a liberty interest arising from the manner in which he was discharged that is redressable as a due process violation. Specifically, he asserts that the Defendants violated due process in two ways; first, by defaming him when they discharged him, and second, by foreclosing the possibility of future employment by defaming him at his discharge.

Absent some kind of entitlement or guarantee, due process does not by itself protect a person's right to a particular job. *See Board of Regents v. Roth*, 408 U.S. 564, 572–73, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548, 558–59 (1972). Nor does due process protect against an injury to reputation alone. *See Edwards v. California University of Pennsylvania*, 156 F.3d 488 (3d Cir.1998), *petition for cert. filed*, No. 98–964 (U.S. Dec. 11, 1998). However, a due process claim may be made if a serious employment action, certainly one like the discharge here:

> (1) is based on a charge against the individual that might seriously damage his standing and associations in the community ..., for example, by implying that he had been guilty of dishonesty, or immorality, or (2) imposes on him a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities.

*Chabal v. Reagan*, 841 F.2d 1216, 1223 (3d Cir.1988) (quoting *Robb v. City of Philadel-*

tion of whom is on the basis of merit as determined by eligibility lists and school nurses.

**2.** We note that Plaintiff has argued that under paragraph 13 the parties were supposed to agree on either a lump-sum payment or periodic payments, and that, contrary thereto, the Board paid

him in a lump sum, with negative tax consequences to him. This observation, if true, is irrelevant to the due process analysis since the Plaintiff had no absolute right to periodic payments, *compare Larsen, supra*, and because this claim was not part of the complaint.

*phia,* 733 F.2d 286, 294 (3d Cir.1984)) (citations omitted in *Chabal* ) (*Robb* 's internal brackets and quotation marks omitted). "Moreover, a plaintiff must plead that the allegedly stigmatizing information was 'published' or otherwise disseminated by his government employer to the public." *Chabal,* 841 F.2d at 1223 (citation omitted).

To support his claim of defamation the Plaintiff relies on the Levin report. He contends the report taints him with "rumors of sexual affairs, nepotism, racism, and many other allegations," (Plaintiff's opposition brief at p. 22), as well as comments negatively on his "management style, ability to carry out and implement board policies and objectives, foster an environment of compliance with board policies, leadership ability and overall effectiveness as the superintendent." (*Id.*). Characterizing these as stigmatizing charges, he contends he was entitled to a hearing either before or after his discharge and the failure to give him one violated due process.

In opposition, the Defendants make the following arguments, beginning with two procedural ones. First, the Plaintiff never pled a due process liberty-interest claim based on stigmatizing comments by the Board in connection with his discharge. Hence, he cannot raise such a claim now. Second, even if the court were to consider allowing the presentation of this claim, it would be prejudicial to the Defendants to allow it after the close of discovery.

They make the following arguments on the merits. First, the Plaintiff was not discharged but rather his employment agreement was merely dissolved by a buy-out. Second, the Levin report cannot be the basis of a liberty-interest violation. To begin with, the dissolution was not based on the report, which was issued about two months before the dissolution. Additionally, the report was prepared by a third party. Moreover, the report contains no defamatory or stigmatizing comments and, in fact, clears Poteat of any wrongdoing. Third, none of the Defendants made any defamatory or otherwise stigmatizing comments when the actual buy-out was made. They simply wrote Poteat a check for $326,841.86, and "bade him farewell."

■ We reject the Defendants' procedural arguments. As we read the complaint, it adequately sets forth this type of due process violation. In pertinent part, the complaint alleges that the Board manufactured charges to defame the Plaintiff, to prevent him from fulfilling his contractual obligations, and ultimately to lead to his discharge. Based on this conduct, count I specifically asserts a procedural due process violation. In light of the federal pleading standard, this language should have alerted Defendants to a due process liberty-interest claim based on stigmatizing comments.

Turning to the merits, we reject the Defendants' contention that the claim has no merit just because they dissolved the employment agreement rather than discharge the Plaintiff. The end result was the same. The discharge was accomplished by the dissolution.

■ For the purposes of the summary-judgment motion, we also reject the Defendants' first two objections to reliance on the Levin report, although we admit they have some force. In our view, the publication of allegedly stigmatizing comments need not occur at about the same time as the employment action, just sufficiently close in time that a connection can be made. *See Owen v. City of Independence,* 445 U.S. 622, 633 n. 13, 100 S.Ct. 1398, 1406 n. 13, 63 L.Ed.2d 673, 682 n. 13 (1980) (City council's stigmatizing comments one day before city manager fired plaintiff was sufficiently connected to the discharge to make out due process violation). *See also Ersek v. Township of Springfield,* 102 F.3d 79, 83 n. 5 (3d Cir.1996) (discussing this aspect of *Owen* ). *Owen* also answers the Defendants' contention that the discharge was not based on the Levin report. It is sufficient that any supposed stigmatizing comments occurred in the course of the discharge. *Owen, supra,* 445 U.S. at 633 n. 13, 100 S.Ct. at 1406 n. 13, 63 L.Ed.2d at 682 n. 13. Additionally, that the report was prepared by a third party is not material if the Board can be viewed as adopting the report when it released it to the public. A reasonable person might very well have gotten this impression.

■ However, we agree with the Defendants that this due process claim must fail because the Levin report contains no statements that could reasonably be construed as coming within the type of statements that implicate the Plaintiff's liberty interest in the manner of his discharge.

First, the report contains no statements that would seriously damage Poteat's standing and associations in the community. Poteat's sole basis for saying that it does is the introductory remarks referring to Poteat's "supporters want[ing] to cover up economic advantages to themselves, nepotism, and even sexual relationships." However, as noted by the Defendants, these remarks are not findings. Additionally, they do not refer to Poteat, so that they cannot be statements about him.

Second, the report imposes no stigma or other disability on him that forecloses his freedom to take advantage of other employment opportunities. To support this allegation Poteat relies on the conclusions in the report dealing with his management style. The report had concluded that Poteat had issued at least one policy on promotion that was inconsistent with board policy, had allowed principals to interpret this policy individually, had implemented a summer school program that was inconsistent with board policy, and had not required subordinates to follow board policies.

Poteat asserts that these are negative comments about his abilities that have an adverse effect on future employment. We disagree. These conclusions said nothing about why Poteat had acted as he did. His actions might very well have simply resulted from having different priorities from the Board. Other school boards might have approved of what Poteat did.

Poteat also asserts that the report did not clear him entirely of involvement in grade-changing when it loosely stated that "many of the allegations" of his involvement were untrue and failed to say that all were false. However, in context, this was not stigmatizing since the immediately following language makes clear that his involvement was limited to not supervising subordinates and insuring that they followed board policy, a statement we have already decided was not stigmatizing.

■ Additionally, even if all of the above were negative comments about Poteat's abilities, they still would not qualify as stigmatizing ones. Charges of incompetence do not implicate the liberty interest a public employee has in the manner of discharge. *See Wheaton v. Webb–Petett,* 931 F.2d 613, 617 (9th Cir.1991); *Pealer v. Hallowell,* 622 F.Supp. 1039, 1041 (M.D.Pa.1985) (Caldwell, J.) (quoting *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 366 (9th Cir.1976)); *Karr v. Castle,* 768 F.Supp. 1087, 1097 (D.Del.1991).

Finally, Plaintiff asserts that the possibility of reduced employment opportunities supports his due process claim. We disagree. The mere possibility that his future employment may be affected by the Board's comments is not enough. *Kelly v. Borough of Sayreville,* 107 F.3d 1073, 1078 (3d Cir. 1997).[3]

### B. *The First Amendment Claim.*

The Plaintiff has also asserted a claim that the Board's treatment of him was in retaliation for the exercise of his first amendment right to free speech. He contends the following constitutes speech protected by the first amendment: (1) Plaintiff's "criticisms" of the School Board's attempt to furlough teachers, and cut administrative staff and educational programs for the fiscal years 1996–97 and 1997–98; (2) Plaintiff's directive to administrative staff to withhold public funds from Reamus Jones; and (3) his opinion expressed at the June 1997 school board meeting concerning why students were failing. (Plaintiff's opposition brief at p. 5).

■ The Defendants object to this claim initially by contending that it was never pled in the Plaintiff's complaint. We disagree. The complaint alleges that the Defendant

---

3. The Plaintiff also made a claim for substantive due process but, in our view, he has no substantive due process right to his job. *See Young v. Walp,* No 1:CV–96–456 (M.D.Pa July 19, 1995)(citing in part, *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994) (en banc)).

board members retaliated against him and harassed him after he disagreed with them about the budget cuts. Also, count I specifically mentions a violation of the first amendment and paragraph 36 mentions Poteat's right of free expression being quelled by the Defendants. We will therefore consider the first amendment claim.

 In examining a claim by a public employee that he has been retaliated against for the exercise of free speech, we must decide the following, as instructed by *Azzaro v. County of Allegheny,* 110 F.3d 968 (3d Cir.1997) (en banc). First, whether the speech is protected by the first amendment. This is a question of law. *Id.* at 975. In deciding this question, we must ascertain: (1) whether the speech was on a matter of public concern; and (2) if it was, whether the government's interest in efficiency or effectiveness outweighs the value of the speech.

 To determine if the speech was on a matter of public concern, we must look at the "content, form, and context of a given statement as revealed by the whole record." *Id.* at 976. The speech need not be a public declaration. *Id.* at 977.

Private dissemination of information and ideas can be as important to effective self-governance as public speeches. Thus, if the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context.

*Id.* at 978.

 In determining whether the government's interest in efficiency or effectiveness outweighs the value of the speech, we may also take into account the position the employee holds. A policymaker has "substantially less First Amendment protection than does a lower level employee." *Mcvey v. Stacy,* 157 F.3d 271, 278 (4th Cir.1998); *Hall v. Ford,* 856 F.2d 255, 261 (D.C.Cir.1988); *Moran v. State of Washington,* 147 F.3d 839, 850 (9th Cir.1998) ("we are most doubtful that the Constitution ever protects the right of a public employee in a policymaking position to

criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision"); *Kinsey v. Salado Independent School District,* 950 F.2d 988 (5th Cir.1992) (en banc); *Coover v. Saucon Valley School District,* 955 F.Supp. 392, 400 (E.D.Pa.1997).

The reason is self-evident. High-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims....

*Hall, supra,* 856 F.2d at 263.

If we decide that the employee's speech is protected under the first amendment, we must then decide if his speech was a substantially motivating factor in his discharge or in any of the other supposedly retaliatory actions against him and whether he would have been discharged even in the absence of his speech. *Azzaro, supra,* 110 F.3d at 975.

Turning to the merits of the claim, we note that the Defendants first contend that it lacks merit because Poteat has not established that any of the alleged speech was made in public or that it was made as a private citizen. In light of *Azzaro,* neither of these is correct. *Azzaro* ruled that speech in the workplace by a public employee can be constitutionally protected. Additionally, the speech need not be a public declaration; it is sufficient if it occurs during a private conversation.

However, we can agree with the Defendants that the Plaintiff's reliance on his refusal to pay the contractor is misplaced. For speech to be protected by the first amendment it first has to be speech. A mere refusal to pay a bill is not.

As to the other situations, the Plaintiff is able to proceed a bit more through the *Azzaro* analysis, but he must ultimately fail with these as well. We agree with the Plaintiff that both speeches dealt with matters of public concern. The content of the speech concerning the Board's attempt to furlough teachers, and cut administrative staff and educational programs for the fiscal years 1996–97 and 1997–98 related to the quality of

the education students would receive. The content of the speech concerning why district students were consistently below national averages and were performing poorly in the classroom related to the effectiveness of the education. Both of these speeches dealt with matters of public concern because "the message conveyed would be relevant to the process of self-governance if disseminated to the community." *Azzaro, supra,* 110 F.3d at 978.

Additionally, there is nothing in their form or context that would detract from their value to the process of self-governance. The first speech was communicated to Board members as part of Poteat's duties. The second one was delivered during the course of a board meeting which dealt in part with grade-changing, possibly involving the Superintendent, and the graduation of students who had not met qualifications. The topic of why students were failing would relate directly to an issue before the Board, and any mixed motives Poteat had in delivering his speech would be irrelevant to whether it dealt with a matter of public concern. *See Azzaro, supra,* 110 F.3d at 979.

Having decided that Poteat's speech was on matters of public concern, the next step would normally be balancing the value of the speech against the Board's interest in efficiency or effectiveness. However, because we have decided that we need not do that for the speech concerning why children were failing and that that speech can be eliminated from this case on the basis of causation, we will provide our analysis of that aspect of the case and then proceed to the balancing for the remaining speech, the ones dealing with budget cuts.

█ The speech concerning why students were failing addressed why students in the District were consistently below national averages and were performing poorly in the classroom. As a solution, Poteat suggested that the students' parents and the community must, generally, get more involved and hold everyone accountable, specifically mentioning administrators and teachers, but he made no mention of the Board, any member of the Board, or any board policy. Because he did not bring the Board into his speech, no reasonable juror could believe that it was a motivating factor in Poteat's discharge or in any of the other allegedly retaliatory conduct.

█ The only remaining speech at issue is Poteat's disagreement with the Board and the Board's budget committee about certain cuts the latter wanted to make in the school district budget for the fiscal years 1996–97 and 1997–98. The cuts allowed the furloughing of teachers and administrative staff and reduced programs in K–4, K–5 and the Arts Magnet School.

The Plaintiff objected in both years, believing that the cuts violated the School Code because they were being implemented to save money rather than to halt spending on ineffectual educational programs. When teachers filed a grievance over the furloughs, he told the Board's attorney he would so testify at a hearing on the grievance. As a result, the Board settled the grievance for $100,000.

As the cases above have noted, a policymaker has substantially less first amendment protection than a lower level employee. In fact, when a policymaker is involved, that fact appears to be determinative in tipping the balance in favor of the government. *See McVey, supra,* 157 F.3d at 279 ("The circuit courts which have addressed this issue have generally denied agency heads or high-ranking agency personnel First Amendment protection"). For example, in *Hall, supra,* the court decided that speech of an athletic director questioning the legality of his university's athletic practices was not protected by the first amendment because he was a policymaker from whom his superiors should have been able to expect cooperation in implementing their policies. *See also Coover, supra,* which stated that the plaintiff's status as a school superintendent would strongly weight the first amendment balancing in favor of her employer.

In the instant case, Poteat was a policymaker. As superintendent, he was responsible for running the daily operation of the School District, subject to the oversight of the Board, and he had to carry out board policy. An employee charged with implementing policy can be considered a policy-

maker even if his input on the policy is limited. *See Kinsey, supra,* 950 F.2d at 996. Cases dealing with first amendment claims for political affiliation take the same approach. *See Collazo Rivera v. Torres Gaztambide,* 812 F.2d 258 (1st Cir.1987); *Selch v. Letts,* 5 F.3d 1040, 1046 (7th Cir.1993) (in implementing policy an employee may sometimes create policy).

When Poteat's policymaking role is taken into account, the balance tips in favor of the Board. He had twice opposed budget cuts the Board wanted to make and in fact had indicated a willingness to testify against the proposals at a grievance hearing over them, resulting in a settlement and payment to the furloughed teachers. The Board was entitled to a superintendent who would effectuate its policies, not fight them. *See Moran, supra.* Thus, as a matter of law, we decide that Poteat's speech about the budget cuts was not protected under the first amendment.[4]

This case might have been different if Poteat had exposed corruption or criminal activity. In those circumstances, even a policymaker could invoke the first amendment. *See McVey, supra,* 157 F.3d at 280–82 (Murnaghan, J., concurring). Poteat did assert his belief that the cuts were unlawful under the School Code, but on this record we cannot conclude that the cuts were in fact unlawful. Barton Fields, a Defendant board member, testified that the cuts had been made because Poteat had initially indicated that the affected programs were not educationally effective. It appears that under 24 P.S. § 11–1124, such cuts could be made for that reason. Thus, what we have here is a disagreement about policy, and in that area the Board prevails, not the superintendent, even if the superintendent may be right.

▇▇▇ In any event, even if the Plaintiff had a first amendment cause of action here, the individual board members have qualified immunity. It was not clearly established at the time that a policymaker like Poteat had a first amendment right to disagree with his superiors. *See Moran, supra,* 147 F.3d at 850.

### C. *The State Claims For Defamation and False Light.*

The Defendants have also moved for summary judgment on the defamation claim in count V and the "invasion of privacy/false light" claim in count VI. Both of these counts were against the school board members alone. The Defendants assert that the Plaintiff has failed to establish the elements of these claims and that, in any event, they have absolute immunity from suit on these claims as high public officials.

The Plaintiff has not opposed this aspect of the Defendants' motion, and we conclude that he therefore agrees that he has no claim for defamation or false light. We also agree with the individual Defendants that as high public officials they have absolute immunity under state law from suit on these claims. *See Lindner v. Mollan,* 544 Pa. 487, 677 A.2d 1194 (1996). In these circumstances, absolute immunity protects the public interest by allowing public officials to engage in the "unfettered discussion of the public business" without fear of a lawsuit. *Id.* at 491, 677 A.2d at 1196.

### V. *Conclusion.*

We have examined the Plaintiff's other claims of purported wrongdoing on the part of the Defendants and conclude that we need not discuss them since they are not material to the claims the Plaintiff raised.

We will issue an appropriate order.

### ORDER

AND NOW, this 21st day of January, 1999, it is ordered that:

1. The Defendants' motion for summary judgment (doc. 32) is granted.

---

4. We note here that the Defendants deny having discharged Poteat or having taken any retaliatory action against him because of his opposition to the budget cuts. The analysis we must use requires us to assume that they discharged him on that basis and then to decide if the first amendment protected him.

2. The Clerk of Court shall enter judgment in favor of the Defendants and against Plaintiff and close this file.